UNITED STATES FIDELITY & GUARANTY CO. v. CITIZENS' NAT. BANK et al.

(District Court, D. New Mexico. December, 1924.)

No. 886.

I. Depositaries ⬯10—County depository bank, which aided county treasurer in concealing embezzlement by making false reports, held chargeable with actionable fraud upon county and liable for subsequent embezzlements (Code N. M. 1915, §§ 5343–5359; Laws N. M. 1915, c. 59, § 4; Laws N. M. 1915, c. 57, as amended by Laws 1917, c. 70).

A county depository, designated under Laws N. M. 1915, c. 57, as amended by Laws 1917, c. 70, for several months made reports required by the state traveling auditor under Code N. M. 1915, §§ 5343–5359, and Laws N. M. 1915, c. 59, § 4, falsely showing a balance on deposit in excess of the actual amount, the amount of such excess having been embezzled by the county treasurer. Held, that where, in reliance on such reports, the auditor and county

'board failed to discover the embezzlement and were prevented from taking action for removal of the treasurer until after he had embezzled further sums, such reports constituted actionable fraud upon the county and rendered the bank liable for the amount of subsequent embezzlements.

**2. Depositaries ⊙═▷10—As respects depositary's liability for false reports, state traveling auditor of New Mexico, in requiring reports from county treasurers and depositories as authorized by statute, represents and acts for the county and not the state (Code N. M. 1915, §§ 5343–5359).**

In the matter of requiring reports from county treasurers, and county depositories, under authority given by Code N. M. 1915, §§ 5343–5359, the state traveling auditor represents and acts for the county and not the state, so that a false report to him was a false report to the county as respects liability.

**3. Depositaries ⊙═▷10—False reports by depository bank, which aided county treasurer in concealing embezzlement, held proximate cause of loss to county through subsequent embezzlements (Code N. M. 1915, §§ 3954, 3982).**

Where it was made the duty of the state traveling auditor of New Mexico, and the county board by statute (Code N. M. 1915, §§ 3954, 3982), to remove from office a county treasurer guilty of embezzlement, the false reports by a depository bank, which prevented them from obtaining knowledge of such embezzlement, was a proximate cause of loss to the county through subsequent embezzlements of the treasurer.

**4. Subrogation ⊙═▷7(3)—Surety of a county treasurer, which paid a loss to the county through his embezzlement, held subrogated to a right of action by the county against depository bank to recover for the loss.**

The surety of a county treasurer, which paid a loss to the county through his embezzlement, held subrogated to the right of the county to recover from a depository bank, whose false reports were a proximate cause of the loss.

**5. Banks and banking ⊙═▷67—Bank which, without consideration, through consolidation acquired the assets of another bank, which equaled its liabilities, held liable on an obligation of such bank.**

A bank, which through consolidation and without paying any consideration, took over the assets of another bank, which equaled its liabilities, held liable on an obligation of the absorbed bank.

**6. Banks and banking ⊙═▷112—Cashier who made false reports to state auditor held liable personally.**

The cashier of a bank, who, acting as its representative made false reports to state traveling auditor as to state of county treasurer's account, held personally liable for fraud.

In Equity. Suit by the United States Fidelity & Guaranty Company against the Citizens' National Bank and H. P. Saunders. Decree for complainant.

Gillette & Clark, of Denver, Colo., for plaintiff.

R. D. Bowers, of Roswell, N. M., for defendants.

PHILLIPS, District Judge. The plaintiff has filed a motion to amend its complaint to conform to the proof. The proposed amendment is in accordance with the theory upon which the cause was tried and conforms to the proofs made. Therefore the motion to amend will be granted.

The evidence established the material allegations of the complaint as amended, and the facts need not be stated in detail, but will be noticed in connection with a discussion of the legal propositions involved.

[1] During the years 1917 and 1918, Benjamin C. Davisson was the treasurer of Chaves county, N. M., and the American National Bank of Roswell, a national banking corporation, was a county depository for the deposit of county funds pursuant to the provisions of chapter 57, New Mexico Session Laws 1915, as amended by chapter 70, New Mexico Session Laws 1917. During said period Davisson, as treasurer of Chaves county, carried a deposit in said bank of a portion of the funds that came into his hands as such county treasurer.

By chapter 59, New Mexico Session Laws 1915, the office of state traveling auditor was created. Section 4 of this act provided:

Section 4: "* * * The said state traveling auditor shall perform the duties and have the powers imposed upon the said territorial traveling auditor, both as the auditor of the accounts of public officials and as the examiner of banks, trust companies and building and loan associations, and all reports of every kind and character now required by law to be made to the traveling auditor shall hereafter be made to the state auditor; and all provisions of law now applicable to the said traveling auditor appointed under territorial law, and to persons or corporations in their dealings with him are hereby declared applicable to the said state traveling auditor and to persons and corporations in their dealings with him."

The statutes relating to the territorial traveling auditor are found in sections 5343 to 5359, inclusive, New Mexico Stat. Ann. Code 1915. The powers and duties of the traveling auditor are set forth in sections 5344, 5345, 5353, 5355, and 5357, as follows:

Section 5344: "It shall be the duty of such traveling auditor and bank examiner to personally visit each county seat in the

state, at least twice in each year, and oftener if he may deem it necessary for the benefit of the state or said county or on the request of the board of county commissioners of said county or upon the direction of the Governor. He shall examine and audit the accounts of the said treasurers and collectors as to state taxes, and report to the county commissioners in writing, the result, with his recommendations in reference to the same. It is hereby made the duty of said treasurers and collectors to conform their method of bookkeeping and the making of reports, both to the state treasurer and the auditor of public accounts, to the recommendations made by the said traveling auditor and bank examiner. Books of accounts, records and all blanks recommended to be used by the traveling auditor and bank examiner, shall be furnished said county treasurers and collectors free of charge by the state through the office of the traveling auditor and bank examiner. * * *"

Section 5345: "It shall be the duty of the county treasurers and collectors to assist the traveling auditor and bank examiner in his duties as prescribed in the foregoing section, and to allow him full and free inspection of all records, books, papers and documents pertaining to their respective counties. * * *"

Section 5353: "*Traveling Auditor—To Install System of Accounting.* * * * The traveling auditor and bank examiner is hereby authorized and directed to prescribe and install a system of accounting and reporting which shall be uniform for all county officials and institutions, penal, reformatory, educational or charitable, and which shall exhibit true accounts of all funds collected, received and disbursed by all county officers, and officials of state institutions, and shall show the receipt, use and disposition of all public property; the income, if any, derived therefrom; the receipts from all sources of public income and the amount due or received from each source, and all the vouchers and other documents, necessary to isolate and prove the validity of every transaction and claim."

"Section 5355: "*Reports to—Publication.* * * * The traveling auditor and bank examiner shall require from every county official and all state and county institutions, financial reports covering the full period of each year, in accordance with forms and methods prescribed by him. He may also require quarterly and monthly reports, and special reports at any time; all of which reports shall be uniform for the same class of accounts; and he may require any or all such reports to be certified under oath. * * *"

Section 5357: "The traveling auditor and bank examiner and his assistants shall have power to examine the financial affairs of every state and county public office and officer and of every state and county institution, and shall make such examination once each year or oftener if the traveling auditor and bank examiner deem necessary. On every such examination inquiry shall be made as to the moneys and appropriations received and disbursed by such office, whether the requirements of the laws have been complied with, and such other matters as the traveling auditor and bank examiner may prescribe. The traveling auditor and bank examiner and assistants shall have power to administer oaths, to require any officer or person to appear and testify and to produce books and papers at such examinations. Willful, false swearing at such examination shall be perjury and shall be punished as such. A report of each examination shall be made and filed in the office of the traveling auditor and bank examiner."

The state traveling auditor during the years 1917 and 1918 required each county treasurer to prepare a report in triplicate at the end of each calendar month, setting forth, among other things, the total amount collected by the treasurer during said month, the total amount by him lawfully paid out and disbursed, the balance in his custody at the close of business on the last day of the month, the part of said balance held by him in cash and the part thereof held on deposit in county depository banks with the names of all banks holding such deposits, and the balance to his credit in each of such banks. The auditor required the treasurer to forward one copy of this report to him, one copy to the county board of finance, and to retain one copy in the office of the treasurer. He also required the treasurer to furnish with such monthly reports certificates from each county depository bank showing the amount of county funds it had on deposit at the close of the month. The board of county commissioners was ex officio the county board of finance.

Section 15, ch. 57, Session Laws of 1915, supra, required each county depository bank having county moneys on hand to furnish to the county treasurer and to the county board of finance on the 1st day of each month "an itemized statement concerning such deposit, showing the daily balance of such deposit account for the last preceding month, and interest accrued thereon."

By reconciliation of the treasurer's report and the reports furnished by the county depositories, the traveling auditor checked the treasurer's report. This no doubt was also the purpose of the reports required to be made to the county board of finance.

In the month of April, 1917, Davisson had embezzled $7,725 of the funds which came into his hands as county treasurer of Chaves county, and his accounts as such treasurer were short in that amount. On April 30, 1917, he went to the American National Bank and represented to it that he had accepted from several large taxpayers postdated checks, or checks which he had agreed not to present for payment until a later date, aggregating $7,725, in payment of taxes, and had issued tax receipts therefor; that, if in his report to the state traveling auditor he showed this large amount of funds in his vault, the auditor would immediately question the matter.

Section 5476, New Mexico Stat. Ann. Code 1915, then in force, provided as follows:

"Section 50. All taxes and licenses collectible or receivable by the county treasurer, shall be paid only in money, including all state, county, municipal, and school taxes."

Section 20 of chapter 57, Session Laws of 1915, supra, in part reads as follows:

"Any person holding the office of state treasurer or the office of treasurer of any county, * * * having in his custody or under his control any public moneys, * * * who shall use or permit the use of any such moneys for any purpose not authorized by law, or who shall willfully neglect or refuse to deposit the moneys in his custody as required by this act, shall be deemed guilty of a felony and upon conviction thereof shall be punished by a fine of not more than five thousand dollars or by imprisonment for not more than ten years or both."

As a means of keeping the facts from the state traveling auditor and county board of finance, Davisson proposed to the bank that he should draw a check on his account as treasurer in the American National Bank dated April 30, 1917, and deposit it with the bank for credit to the account on which it was drawn; that the bank should not charge the check against the account until May 1, 1917; that the bank should then report to the county board of finance, county treasurer, and traveling auditor, a balance in the bank to the account of Davisson as treasurer in the sum of $7,725 in excess of the actual

balance; that on May 1, 1917, the bank should charge the check against the account, and thus reduce the book balance to the actual balance. The bank, acting through its cashier, H. P. Saunders, who was an executive officer of the bank, agreed to the arrangement proposed by Davisson, and carried it out and forwarded to the traveling auditor through the treasurer and to the county board of finance, false reports certifying the balance of Davisson's account as treasurer with the American National Bank to be $7,725 in excess of the actual amount of county funds on deposit.

This same arrangement was made and carried out the last days of May, June, July, August, and September, 1917, the check being given on the last day of the month, credited that day and charged against the account the first business day of the succeeding month, and false reports were made to the treasurer, county board, and auditor as before. During this period, Davisson's shortage remained the same. It does not appear that Davisson gave any new explanation of his desire for this arrangement to the bank after the first month, but of course his original explanation of postdated checks was wholly unreasonable after the first month, and the bank must have known from the surrounding facts and circumstances long before September, 1917, that Davisson was short in his accounts. Davisson's original explanation to the bank was of course false, but, if it had been true, it would have been in effect a loaning of county funds to the taxpayers with which to pay their taxes, instead of collecting the taxes in cash and depositing them as required by law, and constituted a violation of the statutes. Davisson's embezzlement of the funds was a violation of said section 20, supra. On the last of the seventh month the bank refused to longer carry out this arrangement, and Davisson resorted to a new method of concealing his shortage. On the last day of the month he went to one depository bank and drew a check, for the amount of his shortage, against his treasurer's account in another depository bank. With this check he purchased a cashier's check. He took this cashier's check to the bank on which he had drawn the check with which it was purchased, and deposited the same to his account as treasurer. This increased his balance on the last day of the month the amount of his shortage. The bank check with which the cashier's check was purchased did not clear until the succeeding month. He thus effected false reports from the depository banks.

After the false reports made by the American National Bank, and during his term, Davisson embezzled county funds coming into his hands as treasurer of Chaves county, to the amount of $18,332.68.

Chapter 57 of the Session Laws of 1915, supra, provided for the giving of a surety bond by county treasurers. The plaintiff is a surety company authorized to do business in New Mexico, and executed a bond with Davisson as treasurer during his term commencing January 1, 1917, and ending December 31, 1918. During that period Davisson as county treasurer embezzled the total sum of $26,057.68. In full satisfaction of its liability on the bond the plaintiff company on May 14, 1921, paid this amount to the county of Chaves.

The plaintiff in this action seeks to recover from the defendants the amount it paid as aforesaid, with interest. It predicates its action on the theory that the false and fraudulent reports of the bank to the state traveling auditor and the county board of finance lulled the officers into a state of security, prevented them from discovering Davisson's shortage during the months of April to September, 1917, and caused them not to take the action which they would have taken had true reports been made, to wit, proper steps for the removal of Davisson as county treasurer, and as a result Davisson was continued in office, and embezzled $18,332.68 additional of the funds of Chaves county. It claims the right to recover against the bank, either in its own right or by being subrogated to the rights of Chaves county.

The defendants make three principal contentions:

(1) That the bill does not allege false reports were made to Chaves county, or that it was deceived thereby, or that it relied thereon.

(2) That the fraud was not the proximate cause of the loss and injury to Chaves county or plaintiff.

(3) That plaintiff under the facts was not subrogated to the rights of Chaves county.

In 1915, the state of New Mexico adopted a new policy and enacted comprehensive legislation with reference to the deposit of public moneys. It provided for the designation of county depositories by the board of county commissioners, ex officio county board of finance, and the depositing of all county moneys at interest in such county depositories. These enactments are found in chapter 57, Session Laws of 1915, and chapter 70, Session Laws of 1917, supra. The latter act went into effect March 13, 1917. Under section 12, of chapter 57, supra, as amended by section 2, c. 70, supra, the treasurer was charged with the distribution of county funds, equitably according to capital stock and surplus, among the various county depositories.

The Legislature of 1915, also created the office of state traveling auditor. I have set out the statutes above relative to the powers and duties of that office. It will be noted that, among other things, the auditor was charged with the duty of prescribing and installing a system of accounting and reporting and empowered to require monthly reports from county treasurers. Pursuant to this law, the state traveling auditor had installed a system of accounting and reporting, and required the furnishing of reports by the county treasurers and the county depositories, which, together with the report required by chapter 57, Session Laws 1915, supra, to the county board of finance, gave both the state traveling auditor and the county board an accurate check on the affairs of the county treasurer. In addition to this, by section 1279, New Mexico Stat. Ann. Code 1915, the treasurer was required to "keep a just account of all moneys received and disbursed, and regular accounts of all warrants drawn on the treasury and paid," and to "keep the books, papers and moneys thereto pertaining, ready for inspection of the county commissioners at all times."

What was the purpose of these legislative enactments establishing the office of state traveling auditor empowered and required to install a uniform system of accounting and reporting and of such reports by the county treasurer and county depositories to the auditor and the county board of finance? It must have been to maintain a a constant check on the county treasurer, and to ascertain at regular monthly intervals whether or not he was making honest disposal of the county funds coming into his hands or was embezzling and appropriating any part of the same to his own use. If such a report resulted in knowledge to the state traveling auditor or the county board of finance, or both, that the county treasurer was short in his accounts, was not it the further purpose of such legislation that steps would be taken pursuant to law to remove the unfaithful county officer and prevent the opportunity for further peculations on his part, and thus avoid further loss to the county? On discovery that Davisson was short in his accounts $7,725, it would have been the duty of the state traveling auditor and the county board to have taken proper proceedings

against him, which undoubtedly would have resulted in his summary suspension and ultimate removal from office pursuant to the provisions of chapter 80, sections 3954 to 3982, New Mexico Stat. Ann. Code 1915.

These laws and the duties imposed on the state traveling auditor and the county board of finance were not only for the benefit of the county, but for the benefit of sureties on the bonds of the county treasurer, who executed such bonds as surety, and fixed the premium therefor, taking into consideration the protection afforded by the laws of the state of New Mexico and the duties imposed on the county depositories, the traveling auditor and the county board of finance.

From the foregoing it appears that there was imposed upon the American National Bank as county depository a statutory duty to render a true account to the county board of finance of the amount of funds on deposit with it by Davisson as county treasurer of Chaves county during each day of the preceding month, and the further duty imposed by the state traveling auditor, under his statutory authority to prescribe and install a system of accounting and reporting, to report to him the true balance of such funds deposited with it by Davisson as county treasurer on the last day of each month. The bank violated its statutory duty and the duty imposed upon it by the state traveling auditor pursuant to statute, and for a period of six months rendered false accounts to the traveling auditor and to the county board of finance by means of which Davisson as county treasurer was enabled to cover up and keep secret an embezzlement by him to the extent of $7,725 of the funds which came into his hands as county treasurer. The bank entered into an arrangement with Davisson to make a false depository report to accompany Davisson's report as treasurer to the auditor, and thus joined with Davisson and aided him to render a false report to the auditor for the express purpose of deceiving the auditor as to the condition of Davisson's account as treasurer. Therefore the bank not only violated the statutory duty enjoined on it, but also aided Davisson in making a false report, in violation of the statutory duty enjoined on Davisson to make a true report to the auditor.

Was Chaves county deceived by these false reports and did it act thereon?

[2] Counsel for defendants argue that the state traveling auditor was a state, and not a county, officer, and that fraud practiced upon him was not fraud practiced upon Chaves county, and therefore no cause of action existed against the defendants in favor of Chaves county, and none inured to the plaintiff by right of subrogation. It is true that the state traveling auditor is a state officer, but Chaves county is a political subdivision of the state, and a very substantial portion of the auditor's duties involved a direct service to the counties of the state. In auditing the accounts of county officers (sections 5351 and 5357, supra), and in installing a system of accounting and reporting for county officers (section 5353, supra), the auditor certainly acted for and in behalf of the counties as their agent and representative, so that a false report to him was a false report to Chaves county.

The auditor testified that he relied on the false reports, was deceived thereby, and led to believe that Davisson's reports were true, and because thereof refrained from taking the steps he would have taken if true reports had been rendered, namely, steps to remove Davisson from office and prevent further embezzlements. The auditor also testified that he did not have sufficient help to make regular audits of the accounts of county treasurers, that this work was several years behind, and that he had to depend and did depend on the written reports from the officers and the banks as to the condition of the accounts of county treasurers. My associate, Judge Neblett, held the bill good against motion to dismiss. In my opinion under the bill as amended and the proof which supports it, I must hold against defendants on their first contention.

"It may be stated generally that the elements of actionable fraud consist of: (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. And, in defining actionable deceit or fraud, the elements above mentioned are frequently stated by the authorities or enumerated in the statute. More briefly the elements are the representation, its falsity, scienter, deception, and injury." Volume 26, C. J. p. 1062, § 6.

"It is not necessary that fraudulent representations should have induced plaintiff to do some positive act, but, if they induced him to refrain from doing something which he otherwise would have done, and he thus has suffered a loss, it is sufficient to sustain re-

covery for fraud." C. J. vol. 26, p. 1173, § 81.

"It is not essential to actionable fraud that the guilty party should derive any benefit from his misrepresentation or concealment, nor that he should collude with another who does derive benefit. This rule applies, even though defendant was himself a loser. The gravamen of the action is injury to plaintiff, not benefit to defendant." C. J. vol. 26, p. 1180, § 88.

The fraud did not consist merely of the making of the false reports but it included all the constituent elements which constitute legal fraud. The matters and things which made up the fraud in this case were as follows:

The American National Bank, in violation of its duty, made a false report of material facts, knowing them to be false, to the state traveling auditor, and to the county board of finance and treasurer. It made the report at the request of Davisson, for the express purpose of concealing Davisson's shortage as treasurer and deceiving the auditor and county board. The reports were received and relied upon. The public officials relying upon said reports, refrained from doing what they would have done had the bank complied with its duty and made a true report, namely, removed Davisson from office.

[3] It therefore included the element of reliance, the failure on the part of the officials to take action for Davisson's suspension and removal. A complete case of actionable fraud was made if the consequent loss and injury was proximately caused thereby.

Was the failure to take proper steps to remove Davisson, which the fraud induced, the proximate cause of the loss and injury sustained by reason of Davisson's subsequent embezzlements?

If Davisson had been removed, this loss and injury would not have occurred. If a true report had been made, Davisson's wrongdoing would have been discovered, and undoubtedly the state traveling auditor and county board would have taken proper steps pursuant to the provisions of sections 3954 and 3982, N. M. Stat. Ann. Code 1915, to have Davisson summarily suspended and ultimately removed from office. It would have been their duty to do so. It is presumed they would have done their duty.

In discussing proximate cause, Street, in Foundations of Legal Liability, vol. 1, p. 110, says:

"The terms 'proximate' and 'remote' are thus respectively applied to recoverable and nonrecoverable damage. The question whether damage in a given case is proximate or remote is one of great importance. It is a question of substantive law, and the determination of it determines legal right. It is unfortunate that no definite principle can be laid down by which to determine this question. It is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent. About all that can here be safely ventured is found in an observation of Appleton, C. J., to the effect that: 'Ordinarily that condition is usually termed the cause whose share in the matter is the most conspicuous and is the most immediately preceding and proximate to the event.' The best use that can be made of the authorities on proximate cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other. Not only is the line of demarcation between proximate and remote damage undefined and undefinable; it is really a flexible line, for we find this to be true: That, as the wrongful act which is alleged to have caused the damage increases in moral obliquity or in illegality, the legal eye reaches further and will declare damage to be proximate which in other connections would be considered to be remote. That in wanton trespass or in assault and battery, for instance, legal causation reaches further than in a wrong of mere inadvertence or negligence cannot be questioned."

In 38 Cyc. at page 442, we find this statement:

"In determining liability for a tortious injury, the law regards the proximate and not the remote cause. It looks only to the act or omission from which the result follows in direct sequence without the intervention of a voluntary independent cause and declines to permit further investigation into the chain of events. 'It were infinite,' said Lord Bacon, 'for the law to consider the causes of causes, and their impulsions one upon another; therefore, it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree.' Proximate cause has been variously defined, and the courts have laid down different tests for determining the proximate cause, the principal of which are the test of natural sequence and the test of probable consequences which should have been foreseen. These tests, however, are not entirely satisfactory, and they cannot be applied in all cases. 'Indeed,' it has been said, 'it is im-

possible by any general rule to draw a line between those injurious causes of damages which the law regards as sufficiently proximate, and those which are too remote to be the foundation of an action.' Each case must be decided 'largely upon the special facts belonging to it, and often upon the very nicest discriminations.' It has been said that the proximate cause is the 'efficient cause, the one that necessarily sets the other causes in operation.' It is not required that it be the sole cause. Nor need it be the direct cause. Neither time nor distance controls. The proximate cause is not necessarily that which is nearest in time or place to the result."

The Supreme Court of the United States, in the case of Louisiana Mutual Insurance Co. v. Tweed, 7 Wall, 44 at page 52 (19 L. Ed. 65), said:

"And we have had cited to us a general review of the doctrine of proximate and remote causes as it has arisen and been decided in the courts in a great variety of cases. It would be an unprofitable labor to enter into an examination of these cases. If we could deduce from them the best possible expression of the rule, it would remain after all to decide each case largely upon the special facts belonging to it and often upon the very nicest discriminations."

It is argued that the proximate cause of the loss and injury suffered by Chaves county, and which rendered the surety company liable on its bond, was the act of Davisson in wrongfully embezzling county funds. It is true that the act of Davisson was that of a responsible and intelligent human being, and in many cases it is laid down as a rule that an intervening voluntary act of a third person will be considered the proximate cause. There are many cases in the books, however, recognizing an exception to this rule. In the case of Stone v. Boston, etc., R. Co., 171 Mass. 536, 540, 51 N. E. 1, 3 (41 L. R. A. 794) we find this statement:

"It cannot, however, be considered that in all cases the intervention even of a responsible and intelligent human being will absolutely exonerate a preceding wrongdoer. Many instances to the contrary have occurred, and these are usually cases where it has been found that it was the duty of the original wrongdoer to anticipate and provide against such intervention, because such intervention was a thing likely to happen in the ordinary course of events."

The statutory duty which devolved upon Davisson and the bank to make true reports, as we have heretofore shown, was for the purpose of detecting embezzlement on the part of the county treasurer, and, if discovered, to anticipate and guard against future embezzlements. The bank for a period of six consecutive months made false reports and aided the treasurer, Davisson, in making false reports. It must have known before it ceased making these reports that Davisson was short in his accounts. The duty devolving upon it with reference to these reports, as we have shown, was for the express purpose of anticipating and guarding against the future acts of Davisson which intervened with the resultant loss to the county of Chaves and the plaintiff surety company.

A duty therefore devolved upon the bank to aid the officials in guarding against that which did occur and which the bank alone among those charged with the duty must have anticipated would occur.

Davisson had embezzled funds in his hands as treasurer prior to the making of the false reports. This the bank must have known. They issued false statements for six consecutive months, for the express purpose of concealing this fact from the auditor. They were requested to do so at the end of the seventh month. What was the natural and probable consequence of his remaining in office? Was it not that he would continue his embezzlements? Observation in our common experience tells us that is what an embezzler of trust funds does in the ordinary and usual course of events. Saunders was a man of mature years and an experienced banker. His common sense must have told him that Davisson, if he did what an embezzler usually and ordinarily does, would continue to peculate so long as he could deceive the public officials.

Likewise, after Davisson had continued to request the bank to aid him in concealing a shortage for a period of several months, it must have known that, when it ceased to make the false reports to enable Davisson to conceal his shortage, Davisson would resort to other means of deception to keep the shortage concealed from the auditor. That too is what the bank must have anticipated would occur in the natural and ordinary course of events. That is exactly what did occur. When the bank refused on the seventh month to render further false reports, Davisson resorted to the method commonly known as "check kiting" referred to above. The bank, with knowledge of the previous method of concealment, must have soon recognized the "check kiting" method resorted to by Davisson; yet it complacently sat by, made more false reports effected by

Davisson's new method, and made no disclosure to the officials of its previous false reports.

If the state traveling auditor had come to Roswell, audited Davisson's accounts, found him short, and then made a false report to the county board of finance that Davisson's accounts were regular, and filed a copy of the report in his office, then resigned and turned a copy of the report over to his successor in office, and the successor relied on that report, and Davisson thereafter from time to time increased his shortage during the period of his term of office, would there be any doubt of the liability of the auditor, who made the false report, to the county on his official bond? There is very little difference between the statutory duty devolving upon the state traveling auditor to require reports from the county treasurer and the statutory duty devolving upon the depository banks to make reports to the auditor and county board of finance. The purpose in each case is to aid the county in detecting any embezzlement or violation of law on the part of the treasurer with reference to county funds, and, upon discovery, to avoid further losses. In this case the bank, by collusion with Davisson, absolutely frustrated the objects and purposes of the statute.

This case is not without difficulty, but, after a careful consideration of the briefs submitted by able counsel on both sides, and the authorities and text-writers on the subject, I have reached the conclusion that justice and public policy, especially the latter, dictate that the defendant should be held liable if a correct application of legal principles will permit, and, impelled by that belief, I have concluded to hold that the acts of the bank and Saunders, its cashier, were the proximate cause of the injury complained against.

The case of Hilligas v. Kuns, 86 Neb. 68, 124 N. W. 925, 26 L. R. A. (N. S.) 284, 20 Ann. Cas. 1124, is somewhat analogous to the present case. In this case, the Nebraska court in the opinion said:

"The facts underlying this case are that in 1899 defendant owned a half section of unimproved, unoccupied land in Deuel county of but little value. In that year he sold and conveyed the land by warranty deed to a Mr. Jones, and Jones sold and conveyed it to plaintiff, who resided in Lincoln county. The deeds were not recorded, and the land remained unoccupied, except as strangers to the title pastured cattle thereon. In 1906, the treasurer of Deuel county, Mr. Roudebush, noticed that taxes levied upon the land

for many preceding years were unpaid, and, after ascertaining the name of the record owner and his residence, wrote to defendant. Subsequently Roudebush conferred with Kuns, purchased the land in September of 1906 for $600 subject to the taxes, and received a quitclaim deed from Kuns, which Roudebush at once recorded. Subsequently Roudebush sold the land and conveyed it by special warranty deed to Mr. Delatour for $900, subject to said taxes. Plaintiff alleges that Roudebush and Delatour were bona fide purchasers without notice or knowledge of her title, and that they bought the real estate relying upon the records of Deuel county, all of which defendant well knew; that by reason of the premises she has been deprived of her title to her damage, etc. Defendant admits in his answer that he owned the land in 1899 and conveyed it to Jones, that Jones conveyed it to plaintiff, and thereafter defendant executed and delivered to Roudebush a quitclaim deed therefor. As a separate defense, he alleges that about April 2, 1907, plaintiff sold and conveyed the land by warranty deed and parted with her interest therein, and is estopped from asserting that she was not the owner thereof subsequent to the date of the deed from defendant to Roudebush. A demurrer to the second defense was sustained.

* * *

"Counsel for defendant cite Ring v. Ogden, 45 Wis. 303, and assert that it sustains their argument that the court erred in instructing the jury that, if either Roudebush or Delatour was an innocent purchaser, plaintiff ought to recover, and that the intent with which defendant executed the deed to Roudebush is immaterial. The Wisconsin court holds the mere giving of a second conveyance is not necessarily wrongful, and, therefore, to maintain an action like the instant one, a plaintiff must plead and prove an intent on the part of the defendant to defraud. It may be that cases will arise wherein the intent with which a second conveyance is made will be material, but the defendant herein is in no position to urge that plaintiff's petition is defective in that particular. The facts are all stated, and would not be strengthened by charging bad faith, because no other deduction can be reasonably drawn therefrom. Defendant knew, or ought to have known, that the deed he was making confessedly to a person claiming or seeking a title hostile to the title Kuns had theretofore conveyed was sought and would be used for the purpose of destroying the earlier title. Years since we discarded the theory

that in actions for deceit the intent with which representations are made is a controlling factor, but have said that a party will be held to the reasonable consequences of his acts. Johnson v. Gulick, 46 Neb. 817, 65 N. W. 883, 50 Am. St. Rep. 629. Marshall v. Robert, 22 Minn. 49, is also cited by defendant. The Minnesota court, upon the first appeal of that case in 18 Minn. 405 (Gil. 365), 10 Am. Rep. 201, held that a grantee in a quitclaim deed takes only such title as his grantor actually possessed. Upon the second appeal the defendant was held not liable for any damage flowing from the deed executed by his grantee. In Schott v. Dosh, 49 Neb. 187, 68 N. W. 346, 59 Am. St. Rep. 531, in an exhaustive opinion prepared by Mr. Commissioner Irvine, the preceding decisions of this court touching the status of a purchaser of real estate, whose title is evidenced by a quitclaim deed, are reviewed, and we held the mere fact that a conveyance is a quitclaim will not deprive the grantee therein of the benefits of the recording act nor of the principle of law protecting bona fide purchasers. See, also, Bannard v. Duncan, 79 Neb. 189, 112 N. W. 353, 126 Am. St. Rep. 661. We are not satisfied with the reasoning of the leared judge who wrote the opinion in Marshall v. Robert, supra, nor will we adopt the suggestions of learned counsel for defendant upon this phase of the case. A tortfeasor is answerable for all the consequences that in the natural course of events flow from his unlawful acts, although those results are brought about by the intervening agency of others, provided the intervening agents were set in motion by the primary wrongdoer, or were the natural consequences of his original act. Philpot v. Taylor, 75 Ill. 309, 20 Am. Rep. 241.

"Conceding that Roudebush was told by defendant that he had theretofore conveyed the land and that Roudebush was not and could not for that reason be an innocent purchaser, still Kuns knew that by executing the quitclaim deed he might place Roudebush in position to record the deed, convey the land to an innocent purchaser, and thereby destroy the earlier title. It is tasking human credulity to assert that Kuns did not expect or ought not to have anticipated the precise course of action pursued by his grantee, and we think that, under the facts in this case, defendant must be held if either Roudebush or Delatour was a bona fide purchaser of the land."

[4] The surety company is subrogated to the rights of the county of Chaves. See National Surety Co. v. State Savings Bank (Circuit Court of App. Eighth Cir.) 156 F. 21, 84 C. C. A. 187, 14 L. R. A. (N. S.) 155, 13 Ann. Cas. 421, and the authorities there reviewed.

[5] On or about November 7, 1921, the American National Bank of Roswell transferred all of its property and assets to the defendant Citizens' National Bank of Roswell. The transaction was in effect a consolidation of the two banks. The Citizens' National paid no consideration to the American National for the property and assets transferred. It increased its capital stock and issued to the stockholders of the American National shares of stock in the Citizens' National. The assets so taken over more than equaled the liabilities of the American National Bank, including the claim of the plaintiff. It is therefore my opinion that the Citizens' National is liable for the payment of the plaintiff's claim. Hibernia Insurance Co. v. St. Louis & N. O. Transportation Co. (C. C.) 13 F. 516; Moffat v. Smith, 101 F. 771, 41 C. C. A. 671; Blair v. St. Louis H. & K. Ry. Co. (C. C.) 22 F. 36; Grenell v. Detroit Gas Co., 112 Mich. 70, 70 N. W. 413; Shadford v. Detroit, Y. & A. A. Ry., 130 Mich. 300, 89 N. W. 960; Vicksburg & Y. City Telephone Co. v. Citizens' Telephone Co., 79 Miss. 341, 30 So. 725, 89 Am. St. Rep. 656; City of Altoona v. Richardson Gas & Oil Co. et al., 81 Kan. 717, 106 P. 1025, 26 L. R. A. (N. S.) 651.

[6] If the American National Bank is liable, it follows that the defendant Saunders is also liable. 5 Cyc. 479; 7 C. J. 562, § 168.

I therefore find for the plaintiff in the sum of $18,332.68, with interest from May 14, 1921. A decree may be prepared accordingly.