## NATIONAL SURETY CO. v. MASSACHUSETTS BONDING & INS. CO.

Circuit Court of Appeals, Second Circuit.
May 2, 1927.

No. 216.

1. Subrogation ⬉7(3)—State treasurer's surety, paying judgment obtained by state, became subrogated to state's right against bank.

Surety on bond of state treasurer, on paying judgment obtained against it by state, became subrogated to cause of action existing on behalf of state against bank in which treasurer had maintained a "bogus deposit."

2. Insurance ⬉684—Surety on state treasurer's bond, compromising claim against bank to which it had become subrogated, held not required to account to reinsurer on basis of full recovery on claim.

Where surety on state treasurer's bond obtained reinsurance to cover part of its liability under an agreement entitling reinsurer to share in all rights, recourses, collateral, and indemnity held by the surety company, and after default and payment of judgment obtained by state on bond compromised a claim to which it had become subrogated against a bank in which state treasurer had maintained a bogus account, held, reinsurer was not entitled to participate in settlement of such claim, and, settlement having been made in good faith, surety company was not required to account to reinsurer on basis of utmost amount that might have been recovered, but for such settlement.

3. Insurance ⬉679—Reinsurer of state treasurer's surety held not entitled to subrogation to state's claim against bank.

Where surety on state treasurer's bond obtained reinsurance under agreement entitling reinsurer to share in all rights, recourses, benefits, collateral, and indemnity held by the surety company, held, reinsurer was not entitled to be subrogated to claims of state against bank in which state treasurer had maintained a bogus account, as was surety on bond.

4. Insurance ⬉678—State treasurer's surety held not to have obtained reinsurance through falsely representing depository liability of banks holding state money.

Reinsurance obtained by surety on state treasurer's bond held not obtained through fraud or misrepresentation concerning depository liability of banks holding deposits of state money.

5. Appeal and error ⬉1010(1)—Findings of fact by trial court are binding on appellate court.

Trial court's findings of fact, supported by evidence, are binding on appellate court.

6. Insurance ⬉682—Reinsurer of state treasurer's surety held not relieved from liability by failure of surety to report on investigation made on rumors of dishonesty.

Surety on state treasurer's bond, making investigation in response to rumors of dishonesty on part of state treasurer and one of his deputies, held not required to give reinsurer notice of contents of report received; hence, failure to do so did not relieve reinsurer.

7. Insurance ⬉682—State treasurer's surety, suspicious of irregularities, held not bound to reinsurer to act without knowledge of specific misconduct.

Surety on state treasurer's bond, though suspicious of irregularities, held not bound to its reinsurer to act until it had acquired knowledge of some specific fraudulent or dishonest act that might involve reinsurer in liability.

8. Insurance ⬉684—Where state treasurer and deputy jointly defaulted, surety on bonds of both paying judgment on bond of treasurer alone covering all losses, held not liable to reinsurer on theory of its right to recourse against itself on deputy's bond.

Where surety on bonds of state treasurer and one of his deputies obtained reinsurance covering its liability in part as surety for state treasurer, under agreement entitling reinsurer to share in all rights, recourses, collateral, or indemnity held by surety company, and where surety company, after default of both state treasurer and his deputy, working together, paid judgment covering all losses, obtained by state on state treasurer's bond alone, thereby escaping liability on deputy's bond, held, reinsurer was not entitled to reduce its liability by proportionate amount of deputy's bond, on theory that surety was bound to take recourse on deputy's bond against itself, in order to apply the amount of recovery for the benefit of itself and its reinsurers on the treasurer's bond.

9. Contribution ⬉5—Tort-feasor, paying full damage, is not subrogated to rights against fellow tort-feasor.

One tort-feasor, on paying the full damages caused by his wrongful act, is not subrogated to any recourse or benefit against his fellow tort-feasor, which the injured party might have had.

10. Insurance ⬉504—Contribution between insurers will not be enforced, except risk insured be identical.

Identity of risk insured against is essential prerequisite to enforcing contribution between insurers.

11. Insurance ⬉504—Insurance must have been on same interest or property before different policies can be held to contribute to same loss.

Before different policies can be held to contribute to the same loss, insurance must have been on the same interest and the same property or similar part thereof.

Swan, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by the National Surety Company against the Massachusetts Bonding & Insurance Company. Judgment for plaintiff, and both parties bring error. Reversed in part, and affirmed in part.

Louis Marshall and James Marshall, both of New York City, for plaintiff in error.

Wellman, Smyth & Scofield, of New York City (Herbert C. Smyth and Roderic Wellman, both of New York City, of counsel), for defendant in error.

Before HOUGH, MANTON, and SWAN, Circuit Judges.

MANTON, Circuit Judge. In November, 1910, one Allen was duly elected treasurer of the state of Idaho. The plaintiff below (hereinafter called National) executed and delivered Allen's official bond in the penal sum of $200,000, payable to the state of Idaho, the condition of the bond being, inter alia, that Allen should "pay over in accordance with the requirements of the statutes of the state of Idaho all moneys that may come into his hands by virtue of said office, and shall deliver to his successor in said office all writs, papers, books, records and other things pertaining to his said office which may be by law required to be so turned over."

Allen assumed office in January, 1911, and in the following month the defendant below (hereinafter called Massachusetts) executed and delivered to National what is called an "agreement" of reinsurance, wherein for a consideration named and paid it agreed "to pay to [National] upon demand the proportion of the whole loss sustained by [National] that the amount of the reinsurance applied for and granted bears to the total amount of the bond executed by the [National in respect of Allen], including any sum or sums which [National] shall become liable to pay, * * * and also a like proportion of all expenses, costs, and counsel fees incurred by [National] in investigating, settling, or resisting any claim made and in defending, or attempting to defend any action brought against [National], * * * and whenever [National] shall receive information of a derogatory nature affecting the risk insured or of a possible claim or claims prompting a special investigation, [Massachusetts] shall upon demand pay a like proportion of whatever costs or expenses shall be incurred by [National] in making such investigation and taking such steps as it may deem necessary to secure information or to prevent or check a loss or losses under said bond" respecting Allen as treasurer.

This agreement provided that Massachusetts should be "entitled to share with [National] in the proportion which the amount of the reinsurance bears to the amount of the bond and any and all rights, recourses, and benefits both as against the obligee [Idaho] in whose favor said bond was executed by the [National] and principal in behalf of whom said bond was executed, and any other person or persons, corporation or corporations, arising by operation of law or out of the provisions, reservation, and conditions of the said bond."

The agreement also provided that it was "understood that [Massachusetts] shall be liable in every detail that [National] is liable."

Allen served his two-year term of office as treasurer, and was re-elected in the fall of 1912, and in December of that year National again became surety on Allen's official bond, which was similar in language and amount to the instrument of 1910.

Allen had appointed as deputy state treasurer one Coleman, and shortly after National gave its bond in favor of Allen it executed and delivered in December, 1912, to the state of Idaho, another and different bond in the penal sum of $25,000, whereby it became surety for Coleman's good conduct as deputy treasurer in the same words as had been used in respect of Allen as treasurer. No reinsurance was ever procured in respect of this bond for Coleman.

National's second bond in favor of Allen became effective in January, 1913, when he took office for his second term, but not until June 4, 1913, did Massachusetts execute and deliver a second reinsurance agreement.

The language of this agreement is not identical with that of the earlier reinsurance agreement, but it was a part of the agreement "that [Massachusetts] shall be entitled to share with [National] in the proportion which the amount of the reinsurance bears to the amount of the bond in any and all collateral or indemnity held by [National] in connection with said bond and in any and all rights, recourses and benefits accruing to [National] in connection with the said bond."

It was also provided "that if [National] can procure a valid release from said bond either under the terms and conditions thereof or under the law, then [National] shall upon receipt of written notice from [Massa-

chusetts] proceed to procure its release from said bond, and in the event of the failure or refusal of [National] so to do within fifteen days after the receipt of such notice, then the liability of [Massachusetts] hereunder shall immediately cease as to any and all future liability accruing to [National]."

The delay in executing the second reinsurance agreement was due to correspondence between the parties to this suit regarding what was called in Idaho "depository liability." This meant that the state's money was deposited in divers state banks, but each bank having such deposits was required to give bond to the state securing the same. Massachusetts desired assurances from National that this "depository liability" was "satisfactorily covered," and on May 21, 1913, National wrote that it was so advised, but was not "as yet in a position to furnish * * * documentary evidence to that effect."

In May, 1913, one Ensign was an official of National resident in Idaho, and he, on May 20, 1913, furnished information in writing to National as to the nature of the depository liability of the Idaho banks. This information of Ensign was subsequently proven to be erroneous; that is, some of the bonds of chartered companies were in process of cancellation, and the personal sureties were not, as Ensign said they were "O. K." But there is no proof nor finding to the effect that Ensign was not furnishing the best information he could get, or that he was in any way faithless as an employee or officer of National.

This report of Ensign was sent to Massachusetts by National on November 3, 1913, but in the meantime, and on or about June 2d of that year, Massachusetts had written to National that it was "agreeable to us to execute the reinsurance agreement on your assurance that the depository feature is properly covered, and we will receive detailed information to that effect as soon as you are in a position to furnish it."

Apparently by the same mail the second reinsurance agreement went forward. In March, 1914, a representative of National went to Idaho, investigated the treasurer's office as best he could, and reported in substance that Allen was looked upon as honest, but that Coleman was probably thoroughly bad, but of such political influence that it was "dangerous to leave him in, and it is dangerous to put him out, and the danger of one offsets the danger of the other. I am inclined to think that he is too smart to actually steal." This report, or the substance of it, was not communicated to Massachusetts by National.

The crash came in October, 1914. Allen resigned as state treasurer, was indicted for peculation, pleaded guilty, and was duly sentenced. Coleman seems to have admitted peculations of his own to the extent of $22,000, and also seems to have escaped prosecution.

Among the methods of covering up the wrongdoing of Allen was that of maintaining in the Idaho Trust & Savings Bank what was called by some of the witnesses a "bogus deposit," which at periods of examination could be and was made to serve as representing cash on deposit with that bank and belonging to the state. Shortly after Allen had been indicted, it was shown that in the opinion of National's assistant general solicitor this bank was legally liable to the state treasurer, and therefore to the state, to the extent of the alleged "bogus deposit," viz. $62,000.

The state of Idaho, however, did not, so far as this record shows, pursue anybody except National as surety on Allen's bond. It brought no suit on Coleman's bond, but on the Allen bond recovered judgment against National in 1916, which judgment, for $147,361.02, National paid in September, 1916.

But before this, and in December, 1914, National had substantially admitted its liability on Allen's bond, and had accepted from the Idaho Trust & Savings Bank the sum of $22,000 in settlement and satisfaction of any claim which it, as a paying surety, might ultimately have against this bank.

After having paid the Idaho judgment, the National demanded payment from its reinsurer in the amount agreed on, viz. one-eighth of what National had been obliged to pay. Payment was refused, and this action brought, in which National agreed that it must account for the $22,000 obtained from the Idaho Trust & Savings Bank.

The court below held in substance that National was entitled to recover along the lines of its demand, but that it must also make contribution to or for its reinsurer on account of the Coleman bond, and as if a third party had been surety upon that bond, and National by subrogation had recovered $22,000, upon it.

[1, 2] We now consider the defenses. By paying the judgment obtained against it by the state, the National became subrogated to any cause of action existing in behalf of the state against the Idaho Trust & Savings Bank. The Massachusetts argues that, because a settlement was made with the Idaho for a sum less than the amount that might have

been recovered against it (Idaho), the National is accountable for the utmost amount that might have been recovered, but for such settlement.

The action is upon two reinsurance agreements. In the second, the Massachusetts agreed to pay immediately to the reinsured one-eighth of any sum or sums which the insured became liable to pay under the bond for defaults occurring during the terms mentioned therein, and it contained the same provisions as to reimbursement of expenses incurred by the reinsured in investigating, settling, or resisting any claim made, and further, "in defending or attempting to defend any action in connection with or brought upon said bond, and in prosecuting or attempting to prosecute the defaulter, and in obtaining or attempting to obtain reimbursement from the principal or from others." The reinsurer was entitled to share with the reinsured in all rights, benefits, and recourses occurring to the reinsured in connection with the bonds. While these reinsurance agreements did not in express terms authorize the settlement made with the Idaho by the National, they did vest the power with the National to settle in good faith all claims which inured to its benefit and to that of its reinsurers, and the settlement made for $22,000 was for the benefit of both parties; the Massachusetts being entitled to credit for its one-eighth share. Nor was it essential or necessary for the reinsured to consult its reinsurers before settling such claims. In the first reinsurance agreement sued on, the reinsurer agreed to pay forthwith to the reinsured the amount of the reinsurance and expenses, if any, whenever the reinsured after investigation determined its liability and notified the reinsurer by letter to that effect; such payment to be made, whether or not the reinsured shall have paid any sum in discharge of its liability upon the bond.

Under the division of this insurance, the National had an interest four times the extent of the Massachusetts. The claim against the Idaho, which the National endeavored to collect and finally adjusted before trial, was fraught with some dangers. The National was a foreign corporation suing in Idaho; the officers of the trust company (Idaho) were influential in the community. Matters of proof were difficult. These matters must have been weighed in determining whether the National, with the larger interest at stake, in good faith adjusted the claim. Under the circumstances, the compromise was made in good faith and in the exercise of its best judgment.

In Hicks v. Poe, 269 U. S. 118, 46 S. Ct. 29, 70 L. Ed. 187, a reinsurance company entered into a participation contract with a surety company which was engaged in the business of writing surety, fidelity, and burglary insurance. It assumed one-third of the liabilities on the risks undertaken by the surety company during a period of five years, and upon annual accountings was to receive one-third of the profits and pay one-third of the losses, leaving the management of the business to the surety company without restriction. The surety company being unsuccessful, its receivers, after a five-year period in winding up the business, canceled the outstanding risks by returning unearned premiums to policy holders. It was held that this was not a breach of the contract, and did not relieve the reinsurance company of its liability to pay to the surety company one-third of the losses occurring after the five-year period on business written within it. The court said: "The participation contract did not restrict the discretion to be exercised by the United, and its receivers, in the conduct of the business or in winding it up after the termination of the agreement."

[3] There the reinsurance company was to receive one-third of the profits and, as here, no restriction was placed by the reinsurance company upon the discretion of the reinsured upon the conduct of its business. Here the National settled a contestable claim, while in the Hicks Case the reinsured returned premiums on good risks, which premiums would otherwise have applied to reducing the losses under the agreement. Under the contracts here considered, the Massachusetts was not entitled to subrogation to claims against the Idaho, but only to share with the reinsured in all rights, recourses, and benefits accruing to the reinsured. Consideration of such claims and the prosecution and adjustment thereof was solely within the control and direction of the National, for the benefit of itself and its reinsurers. The evidence as to the investigation of the claims, the institution of the action and the prosecution thereof, together with the communications ultimately resulting in settlement, satisfactorily establish that the National acted in good faith. It sought in every way to do as well as could reasonably be expected the work it had undertaken. It retained local counsel and handled a difficult litigation in a foreign jurisdiction with due regard for the

rights of the Massachusetts, as well as its other coinsurers.

[4, 5] It is argued that the second agreement of reinsurance was entered into by reason of misrepresentations on the part of the National. This relates to the bonding of the bank of Nampa as a depository of state funds. As to this defense, the court below found that the National committed no fraud, nor did it misrepresent with respect to the execution of either agreement of reinsurance. As a finding of fact, the court held there was no intention to defraud the Massachusetts, and it committed no fraud in obtaining the second reinsurance agreement, and, further, that it did not make any representations to the effect that the National Bank of Nampa was solvent, nor that deposits made therein by the state treasurer of funds of the state of Idaho were made in accordance with the statutes of the state; that the National had no knowledge of the amount of deposits of the state funds, or the amount or nature of the security given by the bank to the state of Idaho at the time the Massachusetts executed the second reinsurance agreement; nor did the National represent that it had knowledge of such facts or that the situation with respect to the bank was satisfactory or that no illegal acts had been committed with respect to the deposit of the state funds in the bank, nor did the National conceal from the Massachusetts any facts relating to the bank of Nampa. These findings of fact, supported by evidence, are binding upon us. David Lupton's Sons v. Automobile Club of America, 225 U. S. 494, 32 S. Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699; Fleischmann Co. v. U. S., 270 U. S. 355, 46 S. Ct. 284, 70 L. Ed. 624; Aronstam v. All-Russian Central Union, etc. (C. C. A.) 270 F. 460. The conclusion of law was properly reached.

[6] The National, in response to rumors of dishonesty on the part of Allen and Coleman, caused an investigation to be made by one of its employés, and he rendered a report on March 14, 1914, 10 months after the Massachusetts executed the second reinsurance agreement. It is argued that the contents of this report should have been called to the attention of the Massachusetts, and that for failure so to do it is relieved of liability. The court below found that the National was under no duty to communicate this report to the Massachusetts, and that it acted in good faith toward the Massachusetts with respect to it.

[7] The contents of the report have been referred to above. It recommended against canceling his bond, and stated that Coleman was the dangerous man in the case, and finally that it was dangerous to leave him in and dangerous to put him out, and the danger of one about offset the danger of the other. And, it continued: "I am inclined to think he is too smart to actually steal. If Allen is required to watch him closely he may not be able to 'graft.'" Although suspicious of irregularities, the National was not bound to act until they had acquired knowledge of some specific fraudulent or dishonest act that might involve the Massachusetts in liability for misconduct. American Surety Co. v. Pauly, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977; Natl. Surety Co. v. Western Pac. Ry. Co. (C. C. A.) 200 F. 675; Ætna Indemnity Co. v. J. R. Crowe, etc., Co. (C. C. A.) 154 F. 545; Ætna Indemnity Co. v. Farmers' Nat. Bank (C. C. A.) 169 F. 737. It had at least the right to wait until it had discovered facts sufficiently strong to justify careful and prudent men in charging the state officers with fraud or culpable negligence. Such evidence was not found in the report. What was stated in the report might easily have become libelous as against Allen and Coleman, if published and found to be untrue. Such a risk the National was not obliged to assume. Again, the report would not have justified the cancellation of the bond by either the National or the Massachusetts. The other errors referred to in the Massachusetts writ need not be considered; they present no error.

[8] In the National's writ of error, we are asked to review the decision below in allowing the Massachusetts, as a set-off, one-sixteenth of the sum which was misappropriated by Coleman with the connivance of Allen. The National had executed a bond for Allen as state treasurer to the extent of $200,000, one-half of its liability being the subject of reinsurance. It also executed a bond for Coleman as deputy state treasurer to the extent of $25,000, as to which there was no reinsurance. As the court below found, the bonds executed by the National for Allen and Coleman, respectively, were different and distinct; also that among the items carried as cash in the office of the state treasurer of Idaho, at the time Allen resigned as treasurer, was a check for $22,000, signed by Coleman. The latter shared in and received part of the moneys for which Allen failed to account, and Coleman has never accounted therefor. It was found that Coleman and Allen connived and acted together in at least a part of the transaction which formed the basis of the

*judgment obtained by the state of Idaho against the National, and Coleman has never accounted for his participation therein.* The amount involved in the connivance, other than the $22,000, was not proven. No action was ever brought against the National on the surety bond of Coleman.

[9] It was provided in the second insurance agreement that the Massachusetts should be entitled to share with the National in proportion which the amount of reinsurance bore to the amount of Allen's bond "in any and all collateral or indemnity held by the reinsured in connection with the said bond, and in any and all rights, recourses, and benefits accruing to the reinsured in connection with the said bond arising out of the law or any provision, reservation, or condition in said bond." The Massachusetts contends that the bond executed by the National on behalf of Coleman as deputy state treasurer is to be treated as a recourse and benefit accruing to the Massachusetts. Approving this, the court below also found that the Coleman bond was neither collateral nor indemnity. It was found that any diversion of state funds on the part of Coleman had been made with the connivance of Allen, or that they had acted in concert. Allen was actually and not merely constructively a party to the tort. The state might have proceeded against the bondsmen of either Coleman or Allen. But the bondsman for Allen paid the full claim. One tort-feasor, upon paying the full damages caused by his wrongful act, is not subrogated to any recourse or benefit against his fellow tort-feasor which the injured party might have had.

[10, 11] As a prerequisite to enforcing contribution between insurers, it is essential that the same risk has been insured. Here one bond against the dishonesty and neglect of the state treasurer included neglect in supervising the acts of his deputies and dishonesty on his part in conjunction with them. The other bond insured against the dishonesty and neglect of the deputy state treasurer. The Coleman bond was not surety for the honesty of Allen, nor was the Allen bond security for the honesty of or diligent performance by Coleman or his deputies. Whether or not Coleman and his associates might have been held liable for a part of the same sums for which Allen and his associates were chargeable is not important. They were independent obligations relating to the obligations of two distinct individuals. Before different policies can be held to contribute to the same loss, insurance must have been upon the same interest and the same property or similar part thereof. Eddy v. London Assurance Corp., 143 N. Y. 311, 38 N. E. 307, 25 L. R. A. 686; Lowell Mfg. Co. v. Safeguard Fire Ins. Co., 88 N. Y. 597.

Because the National was a surety for Coleman, and also for Allen, it was not bound to take recourse against itself on the Coleman bond, in order to apply the amount recovered for the benefit of itself and its reinsurers on the Allen bond as a recourse and benefit accruing to it in connection with the bond. In Globe & Rutgers Fire Ins. Co. v. Hines (C. C. A.) 273 F. 774, we held that there can be no right of subrogation in favor of a marine insurance underwriter for loss paid on a ship injured by collision, if the ship which was injured and that which committed the injury are owned by the same party. See, also, Phœnix Ins. Co. v. Erie Transp. Co., 117 U. S. 312, 6 S. Ct. 750, 29 L. Ed. 873.

Again, it appears that, when the second insurance agreement was executed, the Coleman bond was already in force. What the National did in procuring a reinsurance of the risk which it had assumed on the Allen bond was a diminution of that risk, so far as it was concerned. It did not consider or contemplate reducing the risk of the Coleman bond. It could not have been the intention, at the time they executed the second reinsurance agreement, for the parties to have regarded the Coleman bond, on which the National was the sole surety, as a right, benefit, or recourse subject to contribution in favor of the reinsurers. It did not guarantee the reinsurers against loss, nor did the National agree to contribute from one pocket to lessen the deficit which might be incurred in another pocket.

The judgment will be reversed on the plaintiff's writ of error, and affirmed, after reducing the amount of the defendant's set-off, on defendant's writ.

Reversed in part, and affirmed in part.

HOUGH, Circuit Judge, concurred in the result, but, owing to his absence, has not read this opinion.

SWAN, Circuit Judge (dissenting in part). I concur in the result of the opinion, in so far as it affirms the judgment below. I am not able to concur in that portion of the opinion which reverses the allowance to defendant of a credit of $1,375, being one-sixteenth of the Coleman misappropriation of $22,000.

As the opinion states, the state of Idaho might have proceeded against the bondsman of either Coleman or Allen. If the state had proceeded against Coleman's surety, it would

have reduced by $22,000 the recovery against National as surety on Allen's bond. This would have benefited Massachusetts, as reinsurer of one-eighth of the loss on Allen's bond. It would have prejudiced National correspondingly. It is most inequitable to allow the loss of the two insurance companies to be varied by the capricious election of the state of Idaho. While the surety upon Coleman's bond and the surety upon Allen's bond may not technically be cosureties, the principles applicable to cosureties should be applied to them. In 2 Story, Equity Jurisprudence (14th Ed.) § 667, the learned author says, after stating the rule that cosureties must contribute:

"Any other rule would put it in the power of the creditor to select his own victim, and upon motives of mere caprice or favoritism to make a common burden a most gross personal oppression. It would be against equity for the creditor to exact or receive payment from one and to permit or by his conduct to cause the other debtors to be exempt from payment. * * * The ground of relief does not, therefore, stand upon any notion of mutual contract express or implied, between the sureties to indemnify each other in proportion, * * * but it arises from principles of equity independent of contract."

The disability of one joint tort-feasor to enforce contribution from the other affects only the wrongdoers themselves. It should not prevent their sureties from having equitable contribution, because the surety's rights are worked out by subrogation to the rights of the creditor, who may collect full damages from either joint tort-feasor. See American Bonding Co. v. National Mechanics' Bank, 97 Md. 598, 55 A. 395, 99 Am. St. Rep. 466; United States Fidelity, etc., Co. v. Union Bank & Trust Co., 228 F. 448 (C. C. A. 6); United States Fidelity, etc., Co. v. Citizens' National Bank (D. C.) 13 F.(2d) 213.

If there had been a different surety on Coleman's bond, the National, on paying the state of Idaho the loss on Allen's bond, would have been subrogated to the state's right against Coleman and his surety. Brinson v. Thomas, 55 N. C. 414. Similarly, Coleman's surety, if it had paid the state, would have been subrogated to the state's right against Allen and his surety. Therefore the loss should be divided between the innocent sureties, and not fall solely upon the one which the state elects to sue. If the National had obtained $11,000, half of the loss, from Coleman's surety, this would have been a credit which would have accrued to the benefit of the Massachusetts Company under the terms

of its reinsurance. The defendant should not suffer because Coleman's surety happens to be the National itself.

While no authority has been found discussing the precise point in question, the application of the equitable principles above referred to leads to an affirmance of the judgment. Globe & Rutgers Fire Ins. Co. v. Hines, 273 F. 774 (C. C. A. 2), is not inconsistent with this position, for there the insured was not in the position of the state of Idaho with rights of action against two joint tortfeasors and their respective sureties. The insured there had no right of action against any wrongdoer.

I think the judgment should be affirmed in its entirety.