### NATIONAL LABOR RELATIONS BOARD v. QUEST-SHON MARK BRASSIERE CO., Inc.

#### No. 17, Docket 21624.

United States Court of Appeals Second Circuit.

Argued Oct. 4, 1950.

Decided Nov. 9, 1950.

Owsley Vose, Washington, D. C., Atty., National Labor Relations Board (David P. Findling, Asso. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and George H. Plaut, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Adolph I. King, Brooklyn, N. Y. (Leonard P. Walsh, Washington, D. C., and Angelo A. Tumminelli, Brooklyn, N. Y., on the brief), for respondent.

Before LEARNED HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

CLARK, Circuit Judge.

On June 27, 1947, the Corset and Brassiere Workers of New York, Local 32, ILGWU, AFL, filed with the National Labor Relations Board charges that Quest-Shon Mark Brassiere Co., Inc., a corporation engaged in the manufacture, sale, and distribution of brassieres and related products, had committed unfair labor practices by attempting to prevent the unionization of its plants located in Brooklyn, New York. 29 U.S.C.A. §§ 157, 158(a) (1) and (3). A complaint was issued on July 2, 1947, and from August 18 to September 18 a hearing was held before a trial examiner duly appointed by the Board's Chief Trial Examiner. The examiner's report, dated December 31, 1947, found respondent substantially guilty of the charges set out in the complaint, and recommended the usual remedy, *i. e.,* an order directing respondent to stop the unfair practices, offer reinstatement and back pay with seniority where appropriate, and post the customary notices. This proceeding is brought by the Board to enforce its own order of December 7, 1948, modifying in part, but otherwise accepting, the report of the trial examiner.

The facts of the case are set forth in the Board's decision reported in 80 N.L.R.B. 1149, and we shall repeat only some of the more essential points in the evidence adduced at the hearing which appear to characterize respondent's employment activities. Prior to 1946 sporadic and unsuccessful attempts were made to unionize respondent's plants. In October of that year the employees at the 39th Street plant began to discuss the possibility of bringing in a union. One day several of respondent's responsible officials (President Andrew Paolillo, Vice-President Anthony Paolillo, and Plant Superintendent Emilio Paolillo) assembled and addressed the employees there, promising them certain benefits if they would desist in their union demands. On this occasion unions were characterized generally as racketeers and gangsters. Apparently nothing more happened for some months; but on January 22, 1947, the employees at the same plant again began to discuss the union issue, after one of their number had been refused a raise. That afternoon employee Nardella was discharged after the superintendent, observing that she had passed a note to another employee, asked her what union activities were going on in the plant, and she refused to answer. The Board concluded that her summary discharge under these circumstances was in violation of the statute. Later that same afternoon seven other girls who had figured prominently in the union discussions were also summarily discharged by the superintendent, ostensibly for lack of production on their part. But the Board found, significantly, that "the Respondent's production records, as the Examiner found, show that some of these seven employees were among the best producers in the plant, and that workers less efficient than any of these seven were retained."

In the course of the following morning respondent's vice-president, the plant superintendent, and the forelady repeated several times an order that all those employees who wanted a union should leave. The vice-president even restated this command over the plant's public-address system. Thereafter some thirty girls did leave. The Board held it not proven that *all* of these people left *because* of the order

referred to—thus disagreeing with the trial examiner, to respondent's benefit;[1] but, on the evidence it did accept, respondent's relentless campaign against unionization was abundantly shown. Thus, further, on the morning of the 23d, two employees were not allowed to "punch in"—because, they were told, there was no work. The Board found that this lockout was occasioned by their union sympathies, for the evidence was that a majority of the employees remained at the plant that morning and worked the entire day. On the Board's findings the conclusion that respondent had violated the law necessarily followed.

■ The evidence accepted by the Board came from respondent's female employees, particularly from those considered by respondent to be ringleaders in the union activities. It was, of course, disputed by respondent's officials and in various parts by other employees, including employees who had been taken back by respondent. But the evidence against respondent was perfectly credible and naturally found support in the inference to be drawn from the wholesale discharges of workers with good production records at times when other employees were being sought. Consequently respondent's contention that the decision and order of the Board are against the weight of the credible evidence cannot be upheld. Nor, in view of this relatively strong case, do we need to re-examine further the issue whether a greater weight of evidence than formerly is now required to sustain findings of the Board.[2]

■ Under these circumstances, respondent is necessarily forced to attack the fairness or validity of the hearing before the trial examiner on procedural grounds. We pass at once its first point that the taking effect of the Labor Management Relations (Taft-Hartley) Act, 29 U.S. C.A. § 141 et seq., on August 22, 1947, during the hearings required that they be discontinued and new proceedings be instituted. The new act was an amendment asserted to strengthen and improve, not set aside, the earlier act; and continuance of the proceedings (according to whatever changed standards might then obtain) was obviously proper. Except in so far as actual prejudice to the respondent from a failure to observe these standards is shown, respondent has no just ground of complaint. Next the assertion that the hearing was neither fair nor impartial is definitely unsupported on the record before us.

There remain the objections (1) that certain statements obtained on behalf of the Board were not sworn to before a notary, as they appeared to be on their face, (2) that these statements were improperly used before the trial examiner, and (3) that the examiner committed reversible error by refusing to compel the production of all these statements by subpoena *duces tecum* so that respondent might examine them prior to or during the hearing.

■ At the hearing it appeared that the statements of employees, taken by an investigator for the Board, were thereafter notarized on the procurement of a representative of the union, without, however, the personal appearance before the notary public of the persons involved. At this the Board's counsel stated that he was without previous knowledge of this defect and acknowledged the invalidity of the statements as affidavits, but did use them for the discrediting of witnesses as indicated below.

1. The Board accepted the examiner's holding of discriminatory discharges as to 22 employees, but rejected, as not warranted on the evidence, his like recommendation as to 37 others. Respondent does not, of course, assail this latter ruling of the Board.

2. Our view that neither the Labor Management Relations (Taft-Hartley) Act, 29 U.S.C.A. § 160(e), nor the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., had substantially modified

the earlier rule seems at variance with the view of the Sixth Circuit; but the grants of certiorari by the Supreme Court indicate that the issue will soon be settled. See N. L. R. B. v. Universal Camera Corp., 2 Cir., 179 F.2d 749, certiorari granted 339 U.S. 962, 70 S.Ct. 998, and Pittsburgh S. S. Co. v. N. L. R. B., 6 Cir., 180 F.2d 731, certiorari granted 339 U.S. 951, 70 S.Ct. 842. As indicated in the text, neither rule would justify a reversal here.

Respondent first claims that here was some "fraud upon the Board" or its examiner. This is surely an untenable claim. The facts were then known to all, and the possibility of fraud—though not necessarily of error—was then gone. Whatever the impropriety of the acts of the notary and the assisting union representative, the statements remained statements, unsworn or sworn, which were usable to discredit the witnesses in case of conflict with their subsequent testimony at the hearing. The real issue is whether they were used improperly at the hearing, as respondent next asserts.

▇ What actually happened at the hearing was that some of the Board's witnesses gave testimony conflicting with what they had previously said in these statements. Over respondent's objections the Board's attorney was then permitted to introduce the statements before the examiner. With nothing more this would appear to be error in view of the new standard stated in the Taft-Hartley Act—in place of the former disregard—that the "proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States." 29 U.S.C.A. § 160(b) as amended. As stated by Dean Wigmore: "It is universally maintained by the Courts that Prior Self-Contradictions are not to be treated as having any *substantive* or *independent testimonial value";* and this we can properly accept as the district court rule, even though he shows his own lack of sympathy with and question of the basis upon which it rests. 3 Wigmore on Evidence 688, § 1018, 3d Ed. 1940. Hence prior inconsistent statements are admissible not as affirmative evidence to prove the truth of what they affirm, but only as matter tending to show that the witness is not credible, because he has changed his story. Technically, therefore, the statements should have been carefully restricted, on the face of the record, to their purpose to discredit. We do not think a reversal here required, however, for the trial examiner states explicitly in his report that his findings are not rested on the evidence from the discredited witnesses, but on other proof not so impugned. Because of this fact, and because, too, as it appears, the Board carefully examined the record as well for points just such as these, its decision should not be overturned because counsel did not follow the traditional procedure precisely and did not first declare his own witness hostile and then produce the statements as discrediting matter. A reversal to reach the same result later will serve little purpose.

▇ Respondent's last point is shrouded in some obscurity beyond its reliance on the bare grant of the subpoena privilege in the Taft-Hartley Act, 29 U.S.C.A. § 161(1), since it does not show what its purpose was with the evidence it expected to obtain or how it was injured. The statements of those witnesses who still remained hostile to respondent were surely not helpful to it; and the statements which were ultimately used were admittedly not so favorable to it as the testimony of the witnesses themselves. In fact there appears no real use that respondent could or would want to make of these statements. True, the new act did contemplate a broad grant of the subpoena privilege; but the touchstone is that of the district court rules of evidence under the Federal Rules of Civil Procedure, 29 U.S.C.A. § 160(b), quoted supra. Not only do we not see any harm to respondent in the action taken; we also fail to see how the giving of this evidence could have been compelled in district court practice. These were papers developed by the Board's investigator in preparing for the hearing or trial. It is now settled that while there is no absolute privilege for statements of witnesses to counsel in preparation for trial, yet they cannot be obtained as of course; the usual statement appears to be that some necessity for their production must be shown, and death or unavailability of the witnesses are cited. Cleary Bros. v. Christie Scow Corp., 2 Cir., 176 F.2d 370, 372, following Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451. Even if a less strict rule should eventually

develop, there was here no attempt to show any need whatsoever. Had there been, doubtless it would have run into the difficulty discussed above that at most the testimony, rather than the statements, of the witnesses was alone of benefit to respondent.

Here, too, the technical niceties of procedure might perhaps have been preferably observed by an objection on the part of counsel to producing the statements rather than by a motion to quash the subpoenas. The sequence of events was that the examiner first denied the application for the subpoenas to produce the documents, in the discretion that was his before the taking effect of the Taft-Hartley Act, and then on and after August 22, 1947, granted motions for their issuance and they were issued and served. Thereafter, but prior to the return date of the subpoenas, counsel for the Board made his motion to quash which the examiner granted after argument, saying, "I think it is in the nature of a fishing expedition." This was not a very good expression of the reason, but it was in line with a solid tradition, that of the objectors to the federal discovery practice finally settled by the Hickman case. See Advisory Committee's Note to proposed amendment of F.R. 30, Report of Proposed Amendments, 5 F.R.D. 459, 460; Hickman v. Taylor, supra, 329 U.S. at page 507, 67 S.Ct. at page 391; 4 Moore's Federal Practice 1128 et seq., 2d Ed. 1950. The ruling was made after counsel, being called upon to produce, had made his objection; since it was thus so right in substance, there seems little reason to suggest objections to its form.

■ There remains only the question of what amounts to reinstatement for the employees unlawfully discharged. Respondent urges that it offered reinstatement to the employees during the strike. The Board has found, however, that such offers, so far as they involved the 39th Street plant where the employees had worked, were so conditioned on acceptance by the other workers which would not be granted that in practical effect the reinstatement offered was reinstatement only at a new plant of the company at 84th Street. Since there was no contention that their former jobs at the 39th Street plant were no longer in existence, the Board concluded that an offer of work at another and distant plant did not fulfill respondent's obligation. The respondent justified its course by its professed desire to avoid trouble among the workers at the 39th Street plant. We are not in as good a position as the Board to evaluate the conflicting considerations thus presented; in any event the Board has a discretion as to the remedy to be proposed, with which we are not at liberty to interfere. Phelps-Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

An enforcement order will issue.