**UNITED STATES of America,**
**Appellee.**
**v.**

**ALLIED STEVEDORING CORP., John Ward, John Potter and Michael Bowers, Appellants.**

**No. 120, Docket 24119.**

United States Court of Appeals
Second Circuit.

Argued Dec. 3, 1956.

Decided Feb. 4, 1957.

On Petition for Rehearing
Feb. 25, 1957.

Norman S. Beier, New York City, for appellants.

Martin Carmichael, Jr., and Joseph De-Franco, New York City, for appellee.

Before CLARK, Chief Judge, and HAND, Circuit Judge.

HAND, Circuit Judge.

■ The defendants appeal from a judgment convicting them under § 145 (b), Title 26, U.S.Code, of attempting to "defeat and evade" the income tax for the year 1951 of the Allied Stevedoring Corporation, which we shall speak of as "Allied." The appeals came on to be heard before a panel consisting of the Chief Judge, Judge Frank and me on December 3, 1956, and was submitted upon oral argument and printed briefs, that of the appellee being filed on December 19th. In accordance with the usual practice of this court each of the judges filed a memorandum independently, stating his conclusions in detail upon the points involved. Judge Frank's memorandum is dated January 10, 1957, two days before his death; it takes up seriatim all the thirteen "Points," raised in the appellants' brief, and overrules all but VII(a), and also a part of XI and XII, as to which, so far as he considers them valid, he holds the error to have been harmless. The memorandum concludes: "With some doubt as to point VII(a), supra, I vote to affirm." Section 46(d) of Title 28 U.S.C. provides that "A majority of the number of judges authorized to constitute a court or division * * * shall constitute a quorum"; and even when a judge has resigned after argument, or has died after expressing his dissent, a remaining majority has jurisdiction to dispose of the appeal.[1] A fortiori is this true when one judge has died after expressing his concurrence in the disposal adopted by the majority.[2]

1. Hatch v. Morosco Holding Co., 2 Cir., 19 F.2d 766; United States v. Graham, 2 Cir., 102 F.2d 436, 444; Gwathmey v. United States, 5 Cir., 215 F.2d 148, 160.

2. Ayrshire Corp. v. United States, 331 U.S. 132, 138, 67 S.Ct. 1168, 91 L.Ed. 1391; Marcus v. Kane, 2 Cir., 18 F.2d 722; Commercial Credit Corporation v. United States, 2 Cir., 18 F.2d 927; Klein v. Palmer, 2 Cir., 18 F.2d 932; Ruby S. S. Corp. v. Johnson & Higgins, 2 Cir., 18 F.2d 948; United States ex rel. Patti v. Curran, 2 Cir., 18 F.2d 953; National Surety Co. v. Massachusetts Bonding & Ins. Co., 2 Cir., 19 F.2d 448.

The first question is whether the evidence supports the verdict, and this requires some statement of the way in which the "loading" was done on piers 84, 88, 90 and 92 in 1951, for which year "Allied" filed its return. By "loading" we shall mean both putting goods on the floor of a pier from arriving trucks, or putting them upon waiting trucks from the floor of a pier. These were the only activities of "Allied," the physical loading being done by members of Local Union 824 of the International Longshoremen's Association, as employees. When the trucks came to the piers and were loaded or discharged, payment to "Allied" was made in two ways. One was for the truck driver to sign a printed "slip" on which a foreman of "Allied" set down the goods loaded or unloaded and the amount due. The foreman would then give the "slip" to Potter, "Allied's" vice-president, who would in turn give it to a collector for "Allied," and he would collect from the trucking company and remit to "Allied." The other way was for the truck driver to pay the foreman in cash on the pier, and to take the "slip" with a receipt upon it signed by the foreman. The "slips" so signed the drivers would then take to their employers in settling their accounts.

A part of the payments is undisputed; it is common ground that a witness, named Applegate, would receive from Potter "slips" signed by drivers, and take them to the drivers' employers, usually, though not always, receiving cheques in payment that he would give to Potter. These cheques, together with about $3,700 in cash as will appear, must have made up the $90,000 that "Allied" returned as gross income. The prosecution succeeded in tracing $58,000 of these cheques from the truckers, but not the other $30,000. The conceded expenses of "Allied" were about $90,000, so that to succeed the prosecution was forced to prove much larger gross receipts. Its position was that "Allied" had received large sums in cheques or cash that never got into its $90,000 bank deposit, but

that the three individuals kept for themselves. The main outline of its proof was that all four of the steamship lines which were lessees of the four piers in question had "designated" "Allied" as their "public loader" for 1951, in compliance with a notice by the New York Department of Marine and Aviation that "public loaders are permitted * * * only pursuant to your written permission." The prosecution argued that this established prima facie at least, that whatever loading went on upon those piers was done by "Allied." It then put in evidence a great number of "slips" identified as those that had been issued to drivers of truckers and that they had been paid in one way or another. The "slips" had all been printed for "Allied," and bore the number of one of the four piers in question; "Allied's" telephone number was printed upon them and the drivers' names were signed. The argument was that the sum of the amounts contained upon these "slips" was part of the income received in 1951.

The defendants sought to meet this evidence by showing that one, La Magna, a "loader" at South Kearney, New Jersey, had used the same printed "slips" which he procured from someone apparently in the printer's employ. (In all but two instances, however, La Magna had struck out the printed pier number.) In addition several of "Allied's" foremen at the piers testified that they signed "slips" of the same printed issue, for work done by several other "loaders"; for the most part by two, named "Ryan" and "Reilly," who on exceptionally busy days helped out loading on the piers. The driver of a truck would tell the foreman to make out his "slip" in favor of "Ryan" or "Reilly," who would receive and cash it on their own account either on the pier or by cheque from the trucker. The defendants explained this practice, notwithstanding the "designation" of "Allied" as the only "loader" on the four piers, on the ground that the prescribed system was by no means rigidly observed. They therefore insisted that there was no basis for the conclusion

that "Allied" had received the sum of all the payments recorded on the "slips." In addition to "Ryan" and "Reilly" some of the foremen also mentioned other supposed "loaders"; e. g., Hammo, "Bluenose" and others.

In rebuttal of this alleged infirmity in its evidence the prosecution proved that "Ryan" and "Reilly" had disappeared in 1953, to which the defendants retorted that they had probably found it safer to leave after an investigation started of conditions on the piers (the inference being, as we understand it, that it was the part of wisdom for them as unlicensed "loaders" to disappear). Moreover, the prosecution proved that at least on one occasion "Allied's" president, Ward, had procured for the corporation the proceeds of a cheque issued to "Ryan." This evidence was as follows. One Leahy, an employee of "Allied," testified that "Ryan" and "Reilly" had given him cheques to cash which they had received for loading done by them. Leahy was arrested in January 1951, and a cheque for about $700 payable to "John Ryan" was found upon his person. This cheque the detective who had made the arrest took to the defendant, Potter, who told him that the name of the payee was a mistake. Moreover, the defendant, Ward, followed this by a letter to the trucker who had drawn the cheque, declaring: "We are the Union Loaders at Pier 88 * * * and your check should have been made to our name, Allied Stevedoring Co. and to no one else." The endorsement upon this cheque in the name of "John Ryan" was in fact made by one Lussa, who was apparently in the habit of cashing cheques.

Another instance was the testimony of a witness, named Marcel, that a man, whom he merely knew by the name of Murphy, was in the habit of bringing to him "slips" of the issue that we have mentioned which had been delivered to "loaders" at the piers. Marcel paid Murphy 93% of the amount stated and collected the full amount from truckers against whom they were charged. Marcel paid Murphy in cash which Murphy took away, presumably either to pay the "loaders," or to repay himself, if he had already himself cashed them. The prosecution traced $19,300 of such payments made to Marcel, and argued that they were part of "Allied's" income, not only because it was proper to infer so from the fact that "Allied" alone (with the exception of La Magna) had any access to the printed "slips," but also because on fifteen or twenty occasions there had been differences of amount between the "slips" and what the trucker agreed to be the proper charge, and that in these cases he called up Potter on the telephone. Although he did not know Potter's voice, on Murphy's next visit Murphy settled the difference. We agree with the prosecution that from this the jury might have inferred that the "slips" had been issued for "loading" done for "Allied."

Next there are two items, one of about $8,000, the other of $5,000, made up of about $3,700 to the order of "cash" and about $8,000 in cheques to the order of "Ryan" or "Reilly." Of the balance about $700 went to one Sullivan, and about $1,000 were made payable to miscellaneous payees. All this money was received from the truckers in exchange for "slips" in the same name as that of the payees. The cheques, and presumably some cash also, Francis Applegate testified that he collected for the payees. The inference that this money was in fact paid to "Allied" rests upon the fact that it alone was a licensed "loader," and upon the doubts as to the existence of "Ryan" and "Reilly" arising from the evidence we have already detailed. The total of all the payments for "slips" is about $50,000, against which the prosecution acknowledged a credit of about $5,000, leaving $45,000 undeclared.

In addition to these receipts the prosecution proved the receipt of rental from a "loader," named White, for the use of what are called Hi-Lo machines, large machines that raise or lower heavy goods such as rolls of paper-print. The agreed rent to be paid by White was half his earnings and it was collected in cash by one Gallagher, who paid it to Potter or

Bowers directly. The amount as shown on White's books was $29,000. White kept a set of books showing his receipts from truckers for the use of the machines, and had an arrangement with an accountant, named Hampson, by which Hampson at White's request examined White's books each week and from them made up for White a set of "double entry books." The objection to the competence of these books on the ground that they were not shown to have been kept in the regular course of White's business is so patently untenable that we shall not discuss it.

■■ From all these circumstances we agree that the jury might properly have found that "Allied" had received over $70,000 that it did not declare. We recognize indeed that this conclusion rests upon the premise that the income actually declared—$90,000—did not contain any part of this sum, and in support of this the prosecution proved that $58,-000 of "Allied's" bank deposit was from cheques that could not have duplicated any of these figures; it gave credit also for $3,700 of cash deposited in the account. Thus at best the bank deposit could have included only $28,000 ($90,000 less $62,000) of the other money traced to "Allied," leaving over $40,000 unaccounted for, a "substantial" sum under any definition of that word. What weight the jury should give to this evidence was for them, and them alone, provided that it satisfied their minds beyond any fair doubt.

■ Finally, as to the complicity of Ward, Bowers and Potter. The record shows again and again that all these men were deeply involved in the management of "Allied's" business. The corporation paid no dividends, and the expenses consisted of salaries of $6,250 to each of the three, the daily wages of "loaders" and sundry disbursements claimed in the return. Who but these three could have received the sums unaccounted for, it is impossible to conceive.

This completes all we need say as to the sufficiency of the evidence, and we shall from now on proceed to dispose of the succeeding eleven "Points" of the defendants' by their numbers, assuming an acquaintance with the arguments made in them.

### Point III

■ The indictment charged an "attempt to defeat and evade a large part of the taxes due and owing" from "Allied" "by filing and causing to be filed * * a false and fraudulent tax return." Apparently the argument is that it was a fatal variance as to Potter and Bowers because they were not shown to have had any part in the actual filing of the return. We are not clear that the Fifth Circuit in Vloutis v. United States, 219 F.2d 782 790, meant so to hold; but, if so, we cannot understand why § 2 of Title 18 U.S. C. does not cover the occasion, for, if Ward filed a fraudulent return, it is not possible that he did so on his own, or that the other two did not "aid" and "abet" him; and, if so, they were "principals." Our decision in United States v. Albanese, 2 Cir., 224 F.2d 879, is not reconcilable with any other theory; and this was likewise the ruling in Imholte v. United States, 8 Cir., 226 F.2d 585, 589.

### Point IV

The maximum sentence under § 3616 (a) of Title 26 is a year and the crime charged in the indictment was for filing a fraudulent income tax return, under § 145(b) of that Title, so that if only § 3616(a) applies the defendants ought not to have been sentenced for more than a year. We held the contrary in United States v. Moran, 2 Cir., 236 F.2d 361, 363, and United States v. H. J. K. Theatre Corporation, 2 Cir., 236 F.2d 502, 503; and the Supreme Court denied certiorari in United States v. Moran, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118. However, in Costello v. United States, in which on December 13, 1956, 2 Cir., 239 F.2d 177, we made the same ruling, the Supreme Court has just granted certiorari on January 28, 1957, 77 S.Ct. 388; and until that writ is disposed of we cannot know whether a sentence of more than one year is valid under § 145(b). The minority in

Berra v. United States, 351 U.S. 131, 140, 76 S.Ct. 685, 100 L.Ed. 1013, did not say that a sentence under § 145(b) was wholly invalid, but only that the choice of sections was not open to the prosecution. Since the defendants were confined on June 5, 1956, they would, if sentenced for a year, be entitled under § 4161 of Title 18 to a "good time allowance" of five days a month, which is 60 days, and they would not be entitled to a release at the earliest until April 6, 1957. The question is, therefore, premature until then, and may have been already decided when the day arrives.

### Point V

■ The judge left to the jury four possible hypotheses in order to help clarify the issues. In two of these he suggested that they might take "Allied's" bank deposit as income; and, as we have said, there was about $28,000 in that account that was not definitely identified as income. However it was shown to have been made up of hundreds of small cheques, and the only possibility that these were not income is that "Allied" might have been in the habit of cashing such cheques for others. Considering the number and size of these and the business of "Allied," this was at best no more than an argument to be addressed to the jury.

The judge charged that "any figure in this case from $5,000 up to $73,849 would be a substantial amount," from which it was plain that he meant that anything less would not be "substantial," as it must be if the prosecution was to succeed. How that can be thought prejudicial to the defendants passes our understanding.

### Point VI

■ The motion to suppress evidence received from the State Crime Commission was delayed till the cause had been sent out for trial, till 40 jurors had been assembled, and the prosecution was about to open. That was on February 6th, 1956, and concededly the defense had known of the whereabouts of the papers since December. Rule 41(e), Fed.Rules Crim.Proc., 18 U.S.C., puts the grant of such a hearing in the discretion of the judge unless made "before trial" and here if the trial had not literally begun, the hearing would have delayed it, and the occasion was within the purpose of the limitation.

Moreover, no evidence was suggested to support the premise that the seizure of the books by the State Crime Commission was with the connivance of the Department of Justice.

### Point VII

■ There was ample testimony from the way the business was conducted that it was part of the foreman's business to sign "slips" for the truckers and that it was the practice of the truckers to keep them. This evidence made the "slips" competent; anything else would defeat the business entries statute, 28 U.S.C. § 1732. We have already considered the competency of White's books of original entry.

■ Exhibit 222 does, however, present a question. It was a contemporary memorandum, made by Lechner, an assistant of Abbate, who was a superintendent of the American Export Line. It purported to record a telephone message from Denniston, an assistant to Abbate, and Lechner made the record because Abbate was not present at the time of the call. Denniston's message so recorded was that Bowers had told him that "any figures regarding the number of men used for loading at Pier 84, N. R. were not to be used by the American Export Line." The question was whether this entry was competent evidence of Bowers' instruction to Denniston. In the first place the defendants are mistaken in speaking of the record as "double hearsay." What Bowers said to Denniston was not a statement of fact at all, but an instruction to be followed in the future by the Export Line. Moreover, although Denniston did not remember it, any record he might have made of it would have been competent as recorded

memory.[3] Furthermore, although Lechner had no recollection of what Denniston told him, the record was as competent as his testimony would have been, had he remembered the message. True Lechner's recollection would have been hearsay of Bowers' instruction, but we see no reason why it should not be given credence as well as a recorded entry by Denniston. If Denniston had, for example, repeated into a dictograph what Bowers had said, when he found that he could not immediately report to Abbate, no one would doubt that the dictograph record would have been competent evidence of the instruction. Denniston used Lechner as a substitute, that being the practise in the company's business, although it is of course true that the veracity of Lechner's record depends upon his testimony and that there intervenes an oath instead of a mechanical contrivance. If such evidence is not competent, we have made an irrational fetish of the rule against hearsay egregious to any reasonable purpose. We do not share Judge Frank's doubt as to the competency of the record; on the contrary we hold that the record is within the latitude given by Criminal Rule 26.

### Point VIII

■ (A) The evidence as to who were the "loaders" at Pier 86, in 1952, was certainly relevant as to the existence of the supposititious "Ryan" and "Reilly," for they had had no reason in that year to disappear. If they had "loaded" on the piers here in question there was no apparent reason why they should not have "loaded" on this intermediate pier.

■ (B) The testimony that in 1952 Bowers rented loading machines on a 50-50 basis was not irrelevant to the question whether he had rented machines at the same rate in the year before.

■ (C) Bowers' instruction to Denniston in November 1952 was relevant to show his wish to suppress evidence that not more than ten men were ever employed as "loaders" on pier 84. It was the defendants' position, as has already appeared, that the limitation of "loaders" to those licensed by "Allied" was not observed in practise, and the larger the number who in fact "loaded" on the pier the more plausible that position became.

■ (D) It was proper to put in evidence Bowers' signature of the income tax return for 1952 to throw light upon his position in "Allied." It was wholly immaterial whether it incidentally showed that part of his testimony in Exhibit 534A was false; for upon no theory did this invade his privilege against incrimination.

### Points IX and XI

■ The evidence procured from Guttman as to his transactions with Ward was relevant to show that Ward cashed many cheques, issued by truckers for loading tickets, some of them being payable to "Cash" or "Reilly." This being shown, it was proper for the prosecution to press to the limit the relations between the two men.

The defendants make the added challenge to this testimony that they make to the examination of a number of the "loaders," of the printer, of Applegate and of others who dealt with the defendants in matters relevant to their business. The error in all these instances is, stated generally, that the prosecution, having called the witnesses, was allowed to impeach them by showing that they had made contradictory statements, and that this was in effect to substitute the early statements in the jurors' minds for their testimony at the trial. Historically, the doctrine that one may not "impeach" a witness whom one has called rests upon the notion that the party who calls him vouches for his credibility—a notion apparently going back to the time

---

3. Wattenmaker v. United States, 3 Cir., 34 F.2d 741; Putman v. Moore, 5 Cir., 119 F.2d 246, 248; Shokuwan Shimabukuro v. Higeyoshi Nagayama, 78 U.S. App.D.C. 271, 140 F.2d 13, 16; Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 164 F.2d 660, 667.

when all trials were deemed in some degree to demand a divine sanction. A party depended upon the oaths of his witnesses, not because of rational inferences from what they said, but because "they were 'oath-helpers' by whose mere oath, taken by the prescribed number of persons in the proper form, the issue of the cause was determined." [4] As Judge Sanborn said in London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 332, the rule has "come to be more honored in its breach than in its observance," for we deem it now settled that the practise is permissible in the discretion of the judge. Contradictory statements may have a legitimate purpose even though in the words of Dean Wigmore, § 1018(b), they "are not to be treated as having any substantial and independent testimonial value"; and taken by themselves they no doubt are not to be so recognized.[5] They may, however, in fact revive the witness's memory and satisfy him that he was right the first time, or, they may show him the danger of persisting in testimony whose falsity is now detected, and in making him recant. In either event they have a proper function, now generally recognized, even though by itself they have no "testimonial value."

But even when they produce neither result, logically at any rate there is at times no reason to deny their competency. It is one thing to put in a statement of a person not before the jury: that is indeed hearsay bare and unredeemed. But it is quite a different matter to use them when the witness is before the jury, as part of the evidence derived from him of what is the truth, for it may be highly probative to observe and mark the manner of his denial, which is as much a part of his conduct on the stand as the words he utters. Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite: "The lady doth protest too much, methinks." This is not to rely upon the statement as a ground of inference, taken apart from the sum of all that appears in court; it is to allow the jury to use the whole congeries of all that they see and hear to tell where the truth lies. We and other courts have a number of times allowed this course to be taken.[6] Indeed to deny this is to hold that nothing that comes from a witness on the stand can be used in support of the issue except his words under oath: the rest of his conduct may be used to refute what he asserts, but for nothing else. In short, out of the whole nexus of his conduct before the jury, they may treat those words alone as affirmatively relevant.

For the foregoing reasons we should not have been willing to reject the contradictory statements, even had the jury been allowed to use them as part of the evidence though the declarants did not "adopt" them. Why it should be thought improper to accept an earlier statement that the witness does "adopt," we are not advised. It is not, however, necessary in the case at bar to hold that the earlier statements might have been so used, because in the "supplementary" charge the judge made it abundantly clear that, except in the case of the defendants themselves, only the witnesses' testimony on the stand was to be taken as evidentiary. However unlikely it may be that this is a feat possible for most minds, when the contradictions have once come before them, it is not as difficult as that required by the more intricate bit of mental gymnastic involved in confining the use of a defendant's admissions when they concern other defendants as well as

---

4. Wigmore, § 896.

5. Bridges v. Wixon, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103; National Labor Relations Board v. Quest-Shon Mark Brassiere Co., 2 Cir., 185 F.2d 285, 289.

6. Di Carlo v. United States, 2 Cir., 6 F.2d 364; Curtis v. United States, 10 Cir., 67 F.2d 943; London Guarantee & Accident Co. v. Woelfle, supra, 83 F.2d 325; Wheeler v. United States, 93 U.S. App.D.C. 159, 211 F.2d 19, 26; United States v. Graham, 2 Cir., 102 F.2d 436, 443.

him. Delli Paoli v. United States, 77 S. Ct. 294. We should indeed welcome any efforts that help disentangle us from the archaisms that still impede our pursuit of truth.

### Point X

Next the defendants complain of the "bias" shown by the judge throughout the trial and in his charge. It is quite true that throughout the seven weeks he intervened repeatedly and at length in the examination of witnesses, though never, so far as we have found, with any intemperateness or attempt to coerce a witness, and always in an effort to clarify the facts, especially when the immediate question was as to the admission of evidence. The defendants upon their side were endlessly obstructive, raising objection upon objection of the most formal kind, sprinkled with repeated motions for a mistrial. Patently, the judge thought it part of his duty, as indeed it was,[7] to see that all the facts were brought out. Nevertheless, over and over again, with what in the end became tiresome iteration, he told the jury that the responsibility was theirs, and that, if he had intimated, or should intimate, any opinion or conclusion of his own, they were not to let it stand in the way of their unimpeded judgment. It is true that he refused to charge them as to some mediate propositions of fact —as, for example, that the prosecution must prove that "Allied" had a monopoly" of "loading" on the four piers—but in this he was right, for to do so is usually hazardous, and never necessary, provided that in the end he makes clear what are the eventual constituent facts that determine guilt, as he did redundantly, in his "supplementary" charge correcting several mistakes into which he had slipped in 58 typed pages of what he said at first.

The only instance to which we are referred that can be thought to be questionable was when he said that "the heavy tread of false swearing is stalking through the record," which he at once followed by another adjuration that his opinion was not to "affect your judgment. * * * It is your function, and your function alone, to decide who told the truth, who didn't tell the truth." It would be absurd to reverse the conviction on this ground, even though it may not have been a happy locution. It is indeed impossible to lay down any general rule that will help to define the limits beyond which a judge may not step in his dealing with a jury. That there are such everyone agrees, and we have so held;[8] but the occasion must be one where it is apparent that he has assumed an attitude which goes further than to express his personal opinion. He must give them to suppose that he is more than an impartial observer; and that what he says has the backing, however vague, of legal authority.[9] We have found nothing in the record of this long and bitterly fought trial to justify any such conclusion.

### Points XII and XIII

The defendants complain of a notice given out to the New York press generally during the trial, announcing the indictment of one Connolly for income tax evasion. The notice read that the "unreported income was mainly derived from Connolly's position as editor of the Longshore News, a now defunct monthly newspaper, published by the Atlantic Coast District of the I. L. A. Additional monies" [sic] "which the defendant failed to report were obtained as fees for attendance at meetings of the executive board of the Atlantic Coast District." We do not understand that there is any complaint of this much of the notice, but it went on to say that be-

---

7. Pariser v. City of New York, 2 Cir., 146 F.2d 431, 433.

8. United States v. Marzano, 2 Cir., 149 F. 2d 923; United States v. Brandt, 2 Cir., 196 F.2d 653.

9. Guthrie v. Curlett, 2 Cir., 36 F.2d 694; Pariser v. City of New York, supra, 146 F.2d 431; United States v. Aaron, 2 Cir., 190 F.2d 144; United States v. Giallo, 2 Cir., 206 F.2d 207, affirmed Giallo v. United States, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421.

fore becoming "Executive Vice President of the I. L. A., Connolly was President of Local 824. Another former officer of that local, Mickey Bowers, is presently standing trial in the Federal Court here for income tax evasion in connection with his operation of the Allied Stevedoring Company. Connolly was among the organizers of this public loading company and was its first president." Moreover, some of the newspapers which published this notice or the substance of it described the local as "Pistol Local 824." The judge examined each member of the jury and found that seven had read what had been published; but all who had done so declared that it had not "impaired" his or her "judgment." The notice had been prepared by an assistant district attorney who delivered it to his chief, and he, when he informed the reporters of the Connolly indictment, appears to have included the second quotation, although his assistant had anticipated that he would not do so.

The notice did indeed show that Bowers had been president of the International Longshoremen's Association; but it had become apparent all through the trial that all "Allied's" "loaders" were members of that union with whom the defendants were necessarily in constant cooperation. So far as the union had acquired any unsavory reputation which might smirch the defendants, it would therefore have been substantially impossible to escape it without an elaborate insistence upon concealment that would have involved a damaging atmosphere of suppression. When all is said, if the associates of an accused person have a bad reputation, the best that can be done is to avoid all allusions to them that can be escaped; and, if that be not enough, there would be no alternative but to try him where the offence was not committed which would be unconstitutional. Moreover, Bowers' connection with the

union could have affected only him, and in his voluntary statement before trial to a "special assistant to the Attorney General" he had already said on March 18, 1953 that he was "affiliated with" Local 824, although he had not held "any position" in it. That later he became its president was not an added circumstance of enough importance to count.

Finally, the income tax that Connolly was charged with evading had not the remotest connection with that under scrutiny in this prosecution, so that the whole supposed harm comes down to the fact that a former president of the Local was charged with the same kind of offence in an utterly dissimilar setting. The Supreme Court has indeed shown itself extremely sensitive to "official intrusion into the privacy of the jury"; [10] but here there was nothing that by the widest stretch can be so regarded. No doubt that is not the entire measure of what may upset a verdict; the press may at times so poison the surrounding atmosphere that it is impossible to have a fair trial at all and the guilty may escape; [11] but it would be to the last degree undesirable to upset judgments, in all other respects just and reasonable, because of circumambient gossamers which not only the jurors said had had no influence upon them, but which would not have had substantial influence upon anyone who was capable of impartial judgment. [12]

It does not seem to us necessary to discuss the charge that the prosecution exceeded the proper limits of propriety. There can be no reasonable, indeed scarcely a possible, doubt that these three men had together engaged in a sordid effort to cheat the Treasury: that is, the citizens at large, for in one way or another it is they who must make up for their thefts. They had a fair trial; they were protected by counsel whose assiduity and skill were manifest throughout. One of them has had the benefit of

10. Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435; Gold v. United States, 77 S.Ct. 378.

11. Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.

12. United States v. Keegan, 2 Cir., 141 F. 2d 248, 258; United States v. Leviton, 2 Cir., 193 F.2d 848, 857.

the jury's recommendation for lenity, the reason for which is not apparent in the record. That they should escape in the tangle of jural subtleties in which their guilt has been enmeshed would be a failure to achieve the purposes for which courts are supported.

Judgment affirmed.

### On Petition for Rehearing

The petition for a rehearing does not contain anything on which we did not mean to pass in our first decision, and we are filing herewith an order denying it. We refuse to delay doing so, because Potter has not yet begun to serve his sentence of a year and the Supreme Court may well have decided the question now before it on certiorari in Costello v. United States, 352 U.S. 988, 77 S.Ct. 388, 1 L. Ed.2d 367, before Ward and Bowers have served out a year's sentence which in any event they must do.

However, our mandate will be understood to give leave to the District Court to reduce the sentences of Ward and Bowers in accordance with the Supreme Court's ruling when it comes down, and also to reduce Potter's sentence to whatever seems to it just in consideration of what appears to be his present very serious illness.