STATE, Respondent v. THWING, Appellant

(172 N.W.2d 277)

(File No. 10648.   Opinion filed November 19, 1969)

392

Fred D. Shandorf, Mitchell, for defendant and appellant.

Gordon Mydland, Atty. Gen., Walter W. Andre, Asst. Atty. Gen., Pierre, for plaintiff and respondent.

HANSON, Judge.

Robert Thwing was convicted of murder and sentenced to a life term in the State Penitentiary in 1952. He now seeks post-conviction review under the Uniform Act. After an extended hearing the trial court denied relief.

On appeal defendant contends his constitutional rights were violated in the following particulars:

1. Denial of motion waiving trial by jury;

2. Denial of a fair trial because of undue publicity; and

3. Introduction in evidence of fruits of involuntary admissions and confessions.

A young country school teacher near Kimball, South Dakota was abducted on November 13, 1951. Three days later Thwing voluntarily surrendered at Brookings, South Dakota, where he was arrested and charged with Rape and Kidnaping by the Brule County authorities. On November 21, 1951 H. T. Fuller, an attorney at Mitchell, was appointed to defend him. On December 4, 1951 the Brule County State's Attorney filed another complaint charging Thwing with the murder of Harvey Burr, which crime was also alleged to have been committed on November 13, 1951. Separate Informations were filed for each offense in the Circuit Court of Brule County. When arraigned on December 11, 1951 defendant entered pleas of "not guilty" and moved for a change of venue from Brule County. The motion was granted and the three cases were transferred to Davison County for trial.

The murder trial commenced on April 8, 1952. Prior to trial defendant made a motion to allow waiver of trial by jury and to be tried by the court. The motion referred to publicity of the case appearing in the Mitchell Daily Republic, newscasts over the Mitchell radio station, and to three detective magazines which had been circulated in Davison County. Defendant contends the denial of this motion deprived him of due process of law. He asserts an accused has an absolute and unconditional right to waive trial by a jury.

With reference to trial by jury our Constitution provides "The right of trial by jury shall remain inviolate * * *", Section 6, art. VI, and "In all criminal prosecutions the accused shall have the right * * * to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." Section 7, art. VI. The obvious purpose of these Constitutional provisions is to guarantee an accused the right to trial by jury. It is a right which cannot be denied or withheld by the state.

This court has considered the question of waiver in prior cases. State v. Ross (1924) 47 S.D. 188, 197 N.W. 234, cert. den., 267 U.S. 601, 45 S.Ct. 462, 69 L.Ed. 808, and error dismissed 271 U.S. 646, 46 S.Ct. 487, 70 L.Ed. 1130, involved a misdemeanor. During the course of trial one juror was excused because of sickness in his family. Upon stipulation of the state's attorney and counsel for defendant the trial proceeded with eleven jurors. After conviction defendant moved to arrest judgment as the verdict had been rendered by a jury of eleven. In denying this motion our court said it could "see no more reason why a person accused of a crime cannot waive his right to be tried by a jury of twelve and submit his case to a jury of a less number, than there is why he cannot waive a jury altogether and plead guilty." The same result was reached in State v. Tiedeman (1926) 49 S.D. 356, 207 N.W. 153, which involved a felony, as the court could find no constitutional distinction between misdemeanors and felonies. Also see State v. Haas, 69 S.D. 204, 8 N.W.2d 569.

The cases of State v. Ross and State v. Tiedeman were cited with approval in the landmark case of Patton v. United States (1930) 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, which recognized the right of an accused charged with a serious offense in Federal Court to consent to trial by a jury of less than twelve, or to waive trial by a jury altogether, with the consent of government counsel and with the sanction of the court. In rejecting the contention that "trial by jury" was jurisdictional in the sense of establishing a tribunal as part of the framework of government the court said "The record of English and colonial jurisprudence antedating the Constitution will be searched in vain for evi-

dence that trial by jury in criminal cases was regarded as a part of the structure of government, as distinguished from a right or privilege of the accused. On the contrary, it uniformly was regarded as a valuable privilege bestowed upon the person accused of crime for the purpose of safeguarding him against the oppressive power of the King and the arbitrary or partial judgment of the court.

\* \* \* \* \* \*

[W]e conclude that article 3, § 2, is not jurisdictional, but was meant to confer a right upon the accused which he may forego at his election. To deny his power to do so is to convert a privilege into an imperative requirement."

In Singer v. United States (1965) 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630, the defendant challenged the conditional waiver feature of Rule 23(a) of the Federal Rules of Criminal Procedure providing that "Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government." The court found no merit in defendant's contention that in addition to his constitutional right to trial by jury he also had a correlative right to trial by the court, which could not be conditioned upon consent of the prosecution or approval of the court. In doing so the court reasoned "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right.

\* \* \* \* \* \*

In light of the Constitution's emphasis on jury trial, we find it difficult to understand how the petitioner can submit the bald proposition that to compel a defendant in a criminal case to undergo a jury trial against his will is contrary to his right to a fair trial or to due process. A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial

judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him. The Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result."

In Singer v. United States, the court left undetermined the question of whether "there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial" by reason of passion, prejudice, public feeling, or some other factor which might render impossible or unlikely an impartial trial by jury. Contrary to defendant's contention, in the present action, this portion of the Singer opinion does not imply an accused under certain circumstances may have an unconditional correlative constitutional right to demand trial by the court. It merely points out the possibility of denying an accused a fair trial and due process by an arbitrary, or unreasonable refusal of a prosecuting attorney to consent to an accused's request to waive trial by jury where passion, prejudice, public feeling, or some other factor may render an impartial trial by jury impossible or unlikely. We are not confronted with this problem in the present action as the mode of trial was not conditioned upon the consent or approval of the prosecuting official. Nor are we confronted with a showing of such passion, prejudice, public feeling, or other factor which rendered an impartial trial impossible or unlikely.

There is a considerable difference in procedures relating to waiver of jury trials in state criminal prosecutions. Some follow the Federal rule requiring consent of the prosecutor and approval of the court. Some allow waiver with the approval of the court. In Illinois, a defendant may choose the mode of trial by virtue of a mandatory section of the Illinois Criminal Code (Ill.Rev.Stat.1953, Chap. 38, par. 736) which provides that "in

any case where the defendant pleads guilty or waives a jury, the cause shall be heard and determined by the court without a jury." People v. Spegal, 5 Ill.2d 211, 125 N.E.2d 468, 51 A.L.R.2d 1337. Also see extensive annotation on "Right of accused to insist, over objection of prosecution or court, upon trial by court without a jury" following the case of People v. Spegal in 5 Ill.2d 211, 125 N.E.2d 468, 51 A.L.R.2d 1337, 1346.

Under our constitutional provision relating to trial by jury, and in the absence of a statute or rule of court governing waivers an accused, in every criminal prosecution (with the possible exception of criminal libel), may waive his constitutional right to trial by jury. However, in relinquishing such right an accused does not acquire a correlative unconditional right of trial by the court. It is subject to the considered approval of the trial court. Consent of the prosecuting attorney is not essential but is a factor to be considered by the court. Before accepting and approving any waiver the trial court should advise the accused of his constitutional right to trial by jury and be entirely satisfied it is an informed and voluntary choice. The proceedings should be made part of the record and the waiver should either be in writing and signed by the accused or be made personally by the accused in open court.

In the present action we find no error or abuse of discretion in the denial of defendant's waiver of trial by jury. In 1952 there was serious doubt whether an accused could waive trial by jury altogether. This was especially true with reference to an offense punishable by death or life imprisonment. The trend of authority approving and favoring waiver in criminal prosecutions is a comparatively recent development. See Tentative Draft Of American Bar Association's Minimum Standards Relating To Trial By Jury, Secs. 1, 2. Furthermore, there was no compelling reason shown why a fair and impartial trial by jury could not be provided.

Defendant cites and largely relies on Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, as authority for

contending he was prevented from having a fair trial by an impartial jury because of undue publicity. The Sheppard case involved incidents occurring during trial which the court characterized as a "carnival" atmosphere and massive, uncontrolled, sensational and inflammatory news coverage described as a "Roman Holiday" for the news media. Conviction was set aside on habeas corpus because the "trial judge did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom".

In the present action the crimes of murder, kidnaping, and forcible rape naturally created considerable publicity. Defendant complains largely of the coverage of the case by the Mitchell Daily Republic and the Mitchell Radio Station KORN, claiming their constant and continuous barrage of adverse publicity deprived him of a fair trial. However, the news coverage of the bizarre facts in the present case as they unfolded can hardly be compared to the intense, partisan, and inherently prejudicial publicity in the Sheppard case which made it impossible to adjudicate defendant's guilt or innocence "in the calmness and solemnity of the courtroom according to legal procedures". Furthermore, the Honorable Walter Seacat, as trial judge, took affirmative action to protect defendant from outside influences and there were no disruptive influences occurring in the courtroom during the trial.

Among other things Judge Seacat granted defendant's motion for a change of venue. Defendant now claims it was an abuse of discretion to change the place of trial from Brule County to Davison County where the "barrage of publicity emanated from". But the evidence shows the Daily Republic and KORN also had wide coverage in Brule County. As a practical matter no news sterile community could be found for a trial of this nature. At least by changing the venue from Brule County to Davison County the trial was removed from the scene of the crimes and where the victims were personally known. A more objective panel of jurors would more likely be available in Davison County than in Brule County.

On voir dire examination defendant was allowed an unlimited number of challenges for cause and numerous prospective jurors were excused because of opinions of guilt. A jury satisfactory to defendant was apparently selected without difficulty as defendant only exercised twelve of his twenty permissible peremptory challenges.

On each adjournment or recess of court the trial judge fully and fairly admonished the jury in the following typical manner:

"Now everybody remain quiet until I say court is adjourned. Now, ladies and gentlemen of the jury, we're about to adjourn during the noon hour. I want you to remember your oath. I want to admonish you that you're not to talk about this case among yourselves, with anyone else, or permit anyone to discuss it or anything about it in your presence. Neither are you to read anything in any newspaper or listen to any radio or any radio broadcast concerning anything about the case. You're to keep your minds free of any outside influence so that your verdict may rest entirely upon the evidence as introduced here from the witness chair, testimony under oath.

The court admonishes everyone in this room that you're not to discuss this case or anything about it in this courthouse or around the court grounds; and especially are you to refrain from mentioning anything about it in the presence of any member of the jury throughout the trial of this case. If I find that someone has violated this admonition and this order, I shall take proper steps to punish you.

At the adjournment of court, I wish the audience and crowd to pass out quietly and as quickly as possible out of the courthouse, and then you can return when court convenes.

Court is adjourned until one-fifteen, and you'll now pass out of the courtroom; and you will remain seated until the audience has left and then you can go about your own affairs.

Let the record show this, to the members of the jury panel: When you return, come directly here, and you can either sit in here, or if you want to be free, you go either in this hall or upstairs to your jury rooms where there are facilities, chairs, and toilets and everything."

In this respect the following appropriate comment was made by the court in United States v. Agueci, 2 Cir., 310 F.2d 817, 99 A.L.R.2d 478:

"The typical jury, in this age of mass-communications, is not hermetically sealed from the events occurring all about them. Of course, an effort must be made by the trial judge to caution jurors against considering extra-judicial statements pertinent to the guilt or innocence of the individuals upon whom they sit in judgment. Where the cautionary instructions are adequate, as they were here, and where the news reporting was merely routine and hardly inflammatory, the trial judge does not abuse his discretion by refusing to declare a mistrial. See United States v. Stromberg, supra, 268 F.2d [256] at 269-270; United States v. Postma, 242 F.2d 488, 495 (2d Cir.), cert. denied, 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957); United States v. Allied Stevedoring Corp., 241 F.2d 925, 935 (2d Cir.), cert. denied, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957). 'Trial by newspaper may be unfortunate, but it is not new and, unless the court accepts the standard judicial hypothesis that cautioning instructions are effective, criminal trials in large metropolitan centers may well prove impossible.' United States v. Leviton, [2 Cir.] 193 F.2d [848] at 857."

The same reasoning applies with equal force to rural areas. Criminal trials will not be impossible in South Dakota, but they will become mere exercises in futility if the perpetrators of our most atrocious and sensational crimes must go free because of adverse publicity generated by their own heinous conduct. The people have a right to be informed about the commission of

crime and the news media have a constitutional right to inform them.

Although defendant was indigent he was defended by most able and competent counsel. Judge Seacat appointed H. T. Fuller, who later became president of the State Bar Association, as defense counsel. He was assisted by another prominent member of the firm, R. E. Morgan, of Mitchell. The record reflects their professional competence in the performance of an unwanted assignment "well done". Despite their efforts the jury, as it could, did not return a verdict of "not guilty by reason of insanity".

During the trial defendant voluntarily took the witness stand and testified to the brutal killing of his uncle, Harvey Burr, as follows:

"A   Well, and as we stood up to this haystack, I asked my uncle again if he would give me my gun, and he said no; he said, 'Robert, I think you've gotten yourself in some trouble and I want to know about it,' and I then told him that I hadn't gotten in any trouble and that I merely wanted my gun, and I reached out my hand and asked him if he would give it to me, but he refused.

Q   Then what did you do?

A   I reached out my hand up to him and asked for the gun, and when he didn't give it to me, I grabbed for it.

Q   Did you get the gun?

A   As I grabbed for it, my uncle—I had both hands on it over his hands on the gun, and he pulled me back a little bit because he was trying to keep me from getting the gun, and as he did that, I then pulled him back to the haystack, and as I pulled

him up he pushed me up against the stack and he bent me over backwards and twisted, and it hurt very much.

Q   Then what happened?

A   Well, when he bent me over backwards and kind of twisted to get the gun away from me, it hurt my back very much, and I pushed and lunged and I don't know what all to get away from him, and I yanked, I just forced the gun from him—I mean, I pulled it away from him.

Q   You got the gun?

A   I had the gun; yes.

Q   Then what transpired?

A   After I had gotten the gun, I just stood there at the haystack and leaned back on it, because my back hurt me quite a little, and my uncle started to come for me to grab for the gun, and I hit him with it.

Q   What happened when you hit him?

A   Well, I hit him a couple of times, and my uncle dropped to his knees.

Q   What was his appearance?

A   Well, when he dropped to his knees, he just looked up at me, and there was blood, quite a little blood running down his face.

Q   What did you do? Where were you from him at that time?

A   Well, I was just—I was very close to him.

Q   All right; then what did you do?

A   I stood there and looked down at my uncle—I realized that I had hit him but I didn't know how hard I had hit him. There was a lot of blood running from his face, and, well, it scared me very much. I wanted to do something to help my uncle, to ask him something, anything, but I just couldn't talk. My uncle just sat there on his knees, looked up at me. He didn't say a word—he just looked.

Q   Then what happened?

A   In just a short time I got down on my knees just a little ways from him and looked at him. I wanted to help him but I didn't know how. I didn't know what I could do. I was just—I knew that I must have hurt him, but I didn't know how bad.

Q   Then what happened?

A   Well, I finally stood up and looked away from him because I just couldn't look at him. He didn't say anything, just looked at me, and all that blood was coming down his face, and I stood up with tears in my eyes, and I looked around, turned away from him, and I looked up more or less to God than anything, and I said, 'My God, what have I done?' And within just a short time when I was turned around and looking up, I heard a cry or a holler or something, and it scared me. I didn't know what to do, and I whirled around and as I whirled around I saw the bloody face of my uncle, he was just coming up at me, and I heard the bang of a gun. That's all of it."

■   Seventeen years later in this post conviction proceeding he claims conviction was based on the fruits of illegal and involuntary statements and admissions. He asserts he was not advised of his right to counsel before being interrogated and statements or admissions made by him were not voluntary, but

were forced as the result of abuse, threats, and beatings administered by law enforcement officials. However, the record affirmatively shows otherwise.

Defendant voluntarily surrendered and was arrested at Brookings, South Dakota, on November 16, 1951. He was thereafter interrogated by Merle Melstad and Roy Milliken, agents of the Attorney General and by Donald Porter, State's Attorney of Brule County. Before making any admissions the record shows defendant was twice advised of his rights and was given the opportunity to, and did, confer with an attorney. Roy Milliken is now deceased, but Merle Melstad testified at the post-conviction hearing that during their first conversation with defendant at Brookings he informed defendant "he didn't have to make a statement unless he so desired, and that any statement he might make could be used against him in any court. I also informed him he was entitled to counsel before making any statement, and I had no further conversation with him at that time until efforts were being made to employ counsel for him." Melstad further testified that neither he nor Milliken ever abused, cursed, beat, or bruised defendant. Nor did anyone else.

The record further shows defendant was transferred from Brookings to Chamberlain on November 17, 1951. He was immediately taken before a justice of the peace who fully informed him of his rights. When defendant indicted he wanted to confer with an attorney the hearing was adjourned and the attorney of his choice was summoned. He consulted with this attorney on the 17th and 18th of November. He did not make any admissions about killing his uncle, Harvey Burr, until the 19th of November at which time he took the authorities out to the haystack where the body was buried.

■ Before defendant's trial commenced his counsel moved the court to make an independent determination as to the voluntariness of any admission or confession outside the presence of the jury. The State agreed to this procedure and Judge Seacat determined the admissibility of such evidence accordingly. As the trial was conducted in 1952, the admissibility of such evi-

dence is not retroactively governed by the standards established in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974.

Post-conviction relief in this case was properly denied.

Affirmed.

All the Judges concur.